**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

METARAIL, INC.,                             )
                                            )
                    Plaintiff,              )
                                            )    C.A. No. 23-1116-GBW
        v.                                  )
                                            )
GOOGLE LLC,                                 )
                                            )
                    Defendant.              )


**DEFENDANT GOOGLE LLC'S OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**


OF COUNSEL:

Gregory F. Corbett
Charles T. Steenburg
Marie A. McKiernan
Jie Xiang
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Tel: (617) 646-8000

Elizabeth A. DiMarco
John W. McGrath
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 571-5001

Dated:  December 15, 2023
11213770 / 12599.00061

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew M. Moshos (#6685)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Defendant Google LLC*

i

## <u>TABLE OF CONTENTS</u>

I.   Introduction ........................................................................................................... 1

II.   Background ............................................................................................................ 2

    A.   Claim 1 of the '626 Patent is Directed to Deep-Linked Ads—Which the Patent Admits Were Already Known in the Prior Art—and Using a Universal Variable Map to Automate Placement of Such Ads ................................................. 2

    B.   The Patent Office Repeatedly Determined that Reciting a Universal Data Map Did Not Render Deep-Linking Claims Patentable During Prosecution of the Earlier '378 Patent to Which the '626 Patent Claims Priority ................................. 5

    C.   Claim 1 of the '626 Patent Closely Tracks Claim 1 of the '378 Patent Before the Extensive Amendments the Patent Office Required For Allowance ................. 7

III.   Legal Standard ..................................................................................................... 8

    A.   Motion to Dismiss ............................................................................................. 8

    B.   Overview of Law on Patent Eligibility ............................................................ 8

IV.   Argument .............................................................................................................. 9

    A.   *Alice* Step One: Claim 1 of the '626 Patent Is Directed to An Abstract Idea .............. 9

        1.   Claim 1 Concerns Automating the Creation of Deep-Linked Ads to Obviate the Need for Manual Programming ........................................................ 10

            a.   The Specification Admits That Deep-Linked Ads Had Previously Existed and Were Created Manually ........................................................... 10

            b.   Following *Alice*, the Federal Circuit Has Repeatedly Held Automating Existing Human Processes to Be Abstract ........................... 11

        2.   The "Universal Variable Map" At Best Concerns the Abstract Idea of Indexing and Translation—Not a Technological Improvement ........................ 13

        3.   The Remaining Claim Elements Likewise Concern Collecting and Analyzing Data—Not Any Technological Improvement ................................... 16

    B.   *Alice* Step Two: Claim 1 Fails to Recite Any Inventive Concept ............................. 17

        1.   Increased Speed and Efficiency is Immaterial ................................................ 17

        2.   Claim 1 is Fundamentally Different From Those At Issue in *DDR* ................. 18

    C.   Amendment of The Challenged Count is Futile ....................................................... 20

V.   Conclusion .......................................................................................................... 20

i

# TABLE OF AUTHORITIES

## CASES

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) ....................................................................... 18-19

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ........................................................................................... passim

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) ............................................................................ 17

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
778 F. App'x 882 (Fed. Cir. 2019) ....................................................................... 10

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ............................................................................ 15

*Buffalo Patents, LLC v. LogMeIn, Inc.*,
C.A. No. 22-1333-MN (D. Del. Aug. 2, 2023) ...................................................... 9

*Buffalo Patents, LLC v. Spotify USA Inc.*,
C.A. No. 22-1335-MN (D. Del. Apr. 10, 2023) ..................................................... 9

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) .............................................................................. 9

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014) .............................................................................. 9

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017) ............................................................................ 11

*D & M Holdings Inc. v. Sonos, Inc.*,
309 F. Supp. 3d 207 (D. Del. 2018) ...................................................................... 12

*D&M Holdings Inc. v. Sonos, Inc.*,
C.A. No. 16-141-RGA, 2017 WL 1395603 (D. Del. Apr. 18, 2017) ..................... 18

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ....................................................................... passim

*directPacket Rsch., Inc. v. Polycom Inc.*,
19-CV-03918, 2023 WL 6301066 (N.D. Cal. Sept. 26, 2023) ............................... 14

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ......................................................................... 9, 16

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ........................................................................... 15

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016) ........................................................................... 15

*Free Stream Media Corp. v. Alphonsp Inc.*,
   996 F.3d 1355 (Fed. Cir. 2021) ........................................................................... 10

*Hantz Software, LLC v. Sage Intacct, Inc.*,
   No. 2022-1390, 2023 WL 2569956 (Fed. Cir. Mar. 20, 2023)................................ 9

*Int'l Bus. Machines Corp. v. Zynga Inc.*,
   642 F. Supp. 3d 481 (D. Del. 2022)....................................................... 14, 15, 17, 18

*Intellectual Ventures I LLC v. AT & T Mobility LLC*,
   235 F. Supp. 3d 577 (D. Del. 2016)...................................................................... 19

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ........................................................................... 10

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
   850 F.3d 1315 (Fed. Cir. 2017) ..................................................................... 13, 16

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016) ........................................................................... 11

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
   50 F.4th 1371 (Fed. Cir. 2022) ........................................................................ 9, 16

*Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*,
   556 U.S. 66 (2012).............................................................................................. 8

*MG Freesites Ltd. v. ScorpCast LLC*,
   651 F. Supp. 3d 744 (D. Del. 2023)...................................................................... 19

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
   839 F. App'x 520 (Fed. Cir. Jan. 12, 2021) .......................................................... 12

*NetSoc, LLC v. Match Grp., LLC*,
   838 F. App'x 544 (Fed. Cir. 2020) ....................................................................... 12

*Nice Sys. Ltd. v. Clickfox, Inc.*,
   207 F. Supp. 3d 393 (D. Del. 2016), *aff'd*, 698 F. App'x 615 (Fed. Cir. 2017)....................... 12

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*,
   C.A. No. 14-612-RGA, 2015 WL 5156526, (D. Del. Sept. 2, 2015), *aff'd*, 669 F. App'x 555
   (Fed. Cir. 2016)................................................................................................ 14

*OIP Techs., Inc. v. Amazon.com, Inc.*,
  788 F.3d 1359 (Fed. Cir. 2015) .............................................................. 9, 11, 12, 17

*PersonalWeb Techs. LLC v. Google LLC*,
  8 F.4th 1310 (Fed. Cir. 2021) ................................................................. 11, 17

*Recentive Analytics, Inc. v. Fox Corp.*,
  C.A. No. 22-1545-GBW, 2023 WL 6122495 (D. Del. Sept. 19, 2023) ........................... passim

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) ............................................................ 17

*Repifi Vendor Logistics, Inc. v. IntelliCentrics, Inc.*,
  No. 2021-1906, 2022 WL 794981 (Fed. Cir. Mar. 15, 2022)................................... 18

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
  873 F.3d 905 (Fed. Cir. 2017) ............................................................. 15

*Sensormatic Elecs. v. Wyze Labs, Inc.*,
  484 F. Supp. 3d 161 (D. Del. 2020), *aff'd*, 2021 WL 2944838 (Fed. Cir. July 14, 2021) ....... 14

*SurgeTech, LLC v. Uber Techs. Inc.*,
  C.A. No. 22-882-GBW, 2023 WL 7182200 (D. Del. Nov. 1, 2023)..................... 12, 13, 15, 19

*Trinity Info Media, LLC v. Covalent, Inc.*,
  72 F.4th 1355 (Fed. Cir. 2023) ........................................................... 16

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ............................................................ 19

## STATUTES

35 U.S.C. § 101................................................................................ passim

## RULES

Fed. R. Civ. P. 12(b)(6)......................................................................... 20

Fed. R. Civ. P. 8(a)(2)........................................................................... 8

# TABLE OF EXHIBITS[1]

| Exhibit Number | Description |
| --- | --- |
| A | Claims as Originally Filed During Prosecution of U.S. Patent No. 9,633,378 (i.e., grandparent application of U.S. Patent No. 10,789,626) |
| B | July 2, 2014 Office Action During Prosecution of U.S. Patent No. 9,633,378 |
| C | June 26, 2015 Office Action During Prosecution of U.S. Patent No. 9,633,378 |
| D | September 25, 2015 Request for Continued Examination During Prosecution of U.S. Patent No. 9,633,378 |
| E | September 6, 2016 Office Action During Prosecution of U.S. Patent No. 9,633,378 |
| F | March 8, 2017 Notice of Allowance During Prosecution of U.S. Patent No. 9,633,378 |
| G | Comparison of Claim 1 of the '626 Patent as Issued (including Redlines Illustrating Amendments to Overcome § 101 Rejection) with Claim 1 of the '378 Patent Application as Originally Filed |
| H | May 28, 2020 Notice of Allowability During Prosecution of U.S. Patent No. 10,789,626 |
| I | Specification of the Application for U.S. Patent No. 10,789,626 as filed |

---

[1] All exhibits described and referenced in this brief are attached with the corresponding Declaration of Marie McKiernan filed herewith.  All pin cites for exhibits refer to the endorsed PDF pagination of the documents filed with the Court.

## I.    INTRODUCTION

Count IV of MetaRail's Complaint fails to state a claim upon which relief may be granted because the only identified claim in Count IV—claim 1 of U.S. Patent No. 10,789,626 ("'626 Patent")—is invalid under 35 U.S.C. § 101 for failure to recite patent-eligible subject matter.[2] Claim 1 concerns "deep-linked" advertisements, which the '626 Patent also describes as "parameter-based" advertising, where parameters that a user is searching for are used to target ad placement and land the search user "deep" into the advertiser's web site or application.

The '626 Patent admits that deep-linked ads were known and used in Internet-based marketing campaigns before the purported invention.  According to the patent, the ostensible innovation was ***automating*** the placement of the deep-linked ads rather than relying on human programmers to place the ads manually.  But the Federal Circuit has consistently held that automating known processes does not constitute patent-eligible subject matter.  The claimed "universal variable map" underlying the automation merely reflects the abstract idea of translating from one set of terms to another—a fundamental practice ever since the dawn of advertising. Claim 1 offers no detail regarding the map aside from reciting that it "link[s] programming variables across multiple sites on the Internet and applications."  But this merely restates the abstract idea of translation.  Nothing in the claim specifies any technological improvement as to how computers or networks function.  The recited "deep-linked ads" operate in exactly the same way—using existing Internet protocols—as earlier deep-linked ads that the '626 Patent admits were previously in commerce.

The only ostensible difference is that the translation via the "data map" allows for the ads to be created automatically—without manual programming.  While that may improve efficiency,

---

[2] Nothing herein limits Google's rights to pursue additional Section 101 challenges.

binding Federal Circuit precedent confirms that such automation is not patentable.  Nor are abstract ideas such as the translation underlying the automation.

## II.    BACKGROUND

### A.    Claim 1 of the '626 Patent is Directed to Deep-Linked Ads—Which the Patent Admits Were Already Known in the Prior Art—and Using a Universal Variable Map to Automate Placement of Such Ads

The '626 Patent (D.I. 1, Ex. H)[3] purports to facilitate "deep-linked ads" by automating the generation of such advertisements online rather than relying on manual programming.  3:16-20 ("So far in the industry, these deep-linked ad connections have been manually created by developing programmatic integrations between variables and fields on the publisher web site and the advertiser web site, created by manual code.").

Deep-linked ads "fast-forward" Internet users "deep" within advertisers' websites (as opposed to the advertisers' home pages)—yielding better "conversion rates" because users find themselves much further along the purchase or "booking process."  3:1-10.  For example, if a user searches "flight rates from London to Amsterdam March 13," the publisher of the site may provide a deep link to a partner airline's "page where the user can purchase a flight ticket to travel by air from London to Amsterdam on March 13."  17:64-18:25. The user, in other words, is "fast-forward[ed]" deep within the advertiser's "conversion funnel," improving return-on-investment for the advertiser as compared with other forms of click ads.  3:1-10.

The '626 Patent does not allege that deep-linked ads themselves are patentable.  Such ads instead are nothing more than the information-age equivalent of a full-service travel agent who coordinates with airlines rather than relying on customers to start the reservation process by calling the main number and explaining their desired itineraries.

---

[3] Unless otherwise indicated, all citations are to the '626 Patent, and all emphasis is added.

Instead, the '626 Patent notes that creating deep-linked ads had traditionally been a "time and resource intensive activity that multiplies as the size of the network grows," as "each web site uses its own field descriptors and variable names." 3:20-27. Creating such ads historically had involved "manually obtain[ing] the names of the respective variables from both publishers and advertisers," then pairing them "through manual programming." *Id*.

Given this purported problem, the inventors sought to take the existing concept (i.e., deep-linked ads) and make it more scalable. The '626 Patent identifies an alleged "need for an automated way to generate deep-linked ads" to promote "***wider adoption*** of these kinds of ads by ***increasing numbers*** of participating web sites and by bringing new ***market efficiencies*** to both publishers and advertisers and thereby produce ***greater economic gains*** for a ***larger cross-section*** of publisher and advertiser sites." 3:36-42.

To this end, the '626 Patent discloses embodiments "for automating the spidering or otherwise data gathering, archiving, inferring, linking and programmatic use of dynamic data and the programming containers" from websites and mobile applications. 3:48-55. The specification describes various techniques for such data generation, including "[c]reat[ing] a list of all the verticals," "[g]enerat[ing] lists of web sites belonging in" such verticals," "[r]unning asynchronous spiders," "[n]ormaliz[ing]" the relevant variables," "[c]reat[ing] mini-integrations or handshakes," "gathering the dynamic landing page URL…as opposed to a static home page," and "run[ning] processes to continually validate, update and fine-tune the data gathering." 4:21-5:3.

However, claim 1 of the '626 Patent does not recite any specific such techniques. Instead it tracks Figure 3 of the patent, which recites only three high-level concepts; (1) "Create and Maintain Universal Map," (2) "Automatically Generate Deep-Linked Ads," and (3) "Present Deep-Linked Ads to E-Commerce Consumers in Real Time":

| Figure 3 | Claim 1 |
|---|---|
| | "A method, comprising: |
| "Create and Maintain **Universal Map**" | generating, by a server computer, a **deep-linked ad** utilizing a **universal variable map** stored in a data store and accessible by the server computer, the **universal variable map** linking programming variables across multiple sites on the Internet and applications; |
| "**Automatically** Generate **Deep-Linked Ads**" | serving, by the server computer, the **deep-linked ad** through a first site or mobile application, the **deep-linked** ad linking a first set of programming variables of the first site on the Internet or the first mobile applications with a second set of programming variables being associated with the second set of programming variables in the **universal variable map** stored in the data store; |
| "Present **Deep-Linked Ads** to E-Commerce Consumers in **Real Time**" | and in response to a user interacting with the **deep-linked ad** displayed on a user device through an instance of the first site on the Internet or the first mobile application:<br><br>extracting, through the first site on the Internet or the first mobile application, values corresponding to the first set of programming variables;<br><br>**automatically** directing the user device to the second site on the Internet or the second mobile application; and<br><br>passing the values corresponding to the first set of programming variables to the second set of programming variables such that one or more fields corresponding to the second set of programming variables of the second site on the Internet or the second mobile application are explicitly or implicitly pre-populated with the values extracted through the first site on the Internet or the first mobile application. |

Other than the concept of automating the generation of deep-linked ads (which the patent admits were known), claim 1 reduces to the concept of a "universal data map" linking programming variables from two different websites or mobile applications. This "map" ostensibly obviates the need for "programmatic integrations between variables and fields on the publisher web site and the advertiser web site, created by manual code." 3:16-20. Put differently, the map *translates* between different terminology to speed up the automation, as Table 1 exemplifies:

| Web Sites | xxx.com | yyy.net | zzz.org | . . . | Normalized Variables |
|-----------|---------|---------|---------|-------|----------------------|
| Variable 1 | Orig | Depart_City | From | . . . | from |
| Variable 2 | Dest | Arrival_City | To | . . . | to |
| Variable 3 | . . . | . . . | . . . | . . . | . . . |
| . . . | . . . | . . . | . . . | . . . | . . . |

10:10-19.  The '626 Patent stresses that such mapping itself enables scalability.  14:54-56.  But the specification never defines any particular form the map must take.  Table 1 is merely "[a] non-limiting example."  10: 9-10.  The only restrictions are defined in claim 1: the map must translate between "programming variables across multiple sites on the Internet and applications."

### B. The Patent Office Repeatedly Determined that Reciting a Universal Data Map Did Not Render Deep-Linking Claims Patentable During Prosecution of the Earlier '378 Patent to Which the '626 Patent Claims Priority

The '626 Patent is a continuation of U.S. Patent No. 10,262,342 ("the '342 Patent") (D.I. 1, Ex. F), which in turn is a continuation of U.S. Patent No. 9,633,378 ("'the '378 Patent) (D.I. 1, Ex. B).  All three patents share a common specification.

During prosecution of the ancestor '378 Patent, the Patent Office repeatedly rejected the pending claims—involving serving "deep-linked ads" using a "universal variable map"—as unpatentable under § 101.  For example, claim 1 as filed concerned a method of "automatically generating a deep-linked ad utilizing a universal variable map, the universal variable map linking programming variables across multiple sites and applications."  Ex. A at A-1.[4]

On July 2, 2014—less than two weeks after the Supreme Court's June 12, 2014 decision in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014)—the Patent Office rejected then-pending claims 1-24 as "directed to non-statutory subject matter" and in particular "the abstract idea of mapping programming containers and serving ads."  Ex. B at B-3.  While noting the claims

---

[4] All exhibits referenced herein are attached to the accompanying declaration of Marie McKiernan.

recited further "hardware and software elements," the Patent Office explained that these were "not sufficient to qualify as being 'significantly more' than the abstract idea." *Id*. at B-4 (citing *Alice*).

MetaRail responded by cancelling originally-filed claim 1 of the ancestor application and filing new claim 25, which the Patent Office again rejected under § 101:

> ***[T]he concept of selecting a deep-linked ad based on a universal variable map and placing the ad on a page would be directed towards a method of organizing human activities***, which is an example identified by the courts as an abstract idea. Further, the claims are essentially directed to using categories to organize, store, and transmit information (i.e. mapping field identifiers and generating an ad based on the mapping).

Ex. C at C-4. The examiner reiterated that none of the additional limitations amounted to significantly more than the abstract idea. For example, "obtaining field identifiers" constituted "mere data gathering," and "directing the user to a second site in response to user interaction" and pre-populating values was a "well-understood and conventional concept." *Id*. at C-5.

MetaRail initially contested this rejection. It contested whether humans could perform the pending claims, which MetaRail also tried analogizing to the claims found eligible in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). Ex. D at D-11-D-15 (asserting that "claimed invention solved a problem specific to the realm of Internet"). The Patent Office nevertheless rejected both arguments and maintained the § 101 rejection. For one, "a human can look at more than one site and infer a plurality of field identifiers on the site such as explicit ones as recited in the claims which conveys the field identifiers are visible." Ex. E at E-4. The Patent Office likewise rejected the analogy to *DDR Holdings* and emphasized that the claimed "methodology for targeted personalized advertising" worked "through the normal operation of the Internet" rather than changing such operations. *Id*. at E-5. Indeed, "passing values from one site or application or pre-populating data entry fields based on previous user input" was "well-known and conventional." *Id*. The Patent Office also again reiterated that a "universal variable map" constituted "well-known and conventional computer functions." *Id*. at E-11.

MetaRail responded by negotiating with the examiner and ultimately obtaining allowance of a significantly narrower claim set.  Ex. F at F-5.  As amended, claim 25 of the application (claim 1 of the '378 Patent as issued), included numerous additional limitations such as:

(1)    requiring the "universal variable map" be a "normalized variable data database" with "searchable classes and attributes of products and services on the Internet";

(2)    using "a set of enhancing rules to enhance results of the obtaining of [a] plurality of computer-readable field identifiers"; and

(3)     using the universal variable map to map "the plurality of computer-readable field identifiers [of the first and second sites or applications] to one another," such that fields of the second site or application can be pre-populated with those from the first "without necessitating any pre-existing relationship between the two."

Ex. F at F-9-F-10.

### C.    Claim 1 of the '626 Patent Closely Tracks Claim 1 of the '378 Patent Before the Extensive Amendments the Patent Office Required For Allowance

As illustrated in Exhibit G, claim 1 of the '626 Patent as issued resembles claim 25 of the application for the earlier '378 Patent—*before the extensive amendments necessary to overcome the repeated § 101 rejections the Patent Office raised during prosecution of the '378 Patent*. Inexplicably, however, the Patent Office did not issue a § 101 rejection during prosecution of the '626 Patent.  Instead, a Notice of Allowability was issued after MetaRail overcame an objection to informalities and a non-statutory double patenting rejection.  Ex. H at H-6-H-11.

Citing paragraphs 9-11 of the specification as filed, the Notice of Allowability suggested that the "[c]laims overcome problems with previously used techniques for online deep-linked ad connections."  *Id.* at H-7-H-8.  But these paragraphs (col. 3, line 7 to col. 4, line 17 of the '626 Patent as issued, *see* Ex. I) merely discuss the desirability of "automating" the previous "manual"

programming process.  *See supra* § II.A.  Similarly, while citing the Federal Circuit's *DDR* decision, the Notice of Allowability neglects the PTO's previous emphasis during prosecution of the '378 Patent that analogous claim language was *not* analogous to *DDR*.  *See supra* § II.B.

## III.    LEGAL STANDARD

### A.    Motion to Dismiss

"To state a claim on which relief can be granted, a complaint must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Recentive Analytics, Inc. v. Fox Corp.*, C.A. No. 22-1545-GBW, 2023 WL 6122495, at *3 (D. Del. Sept. 19, 2023) (J. Williams) (quoting Fed. R. Civ. P. 8(a)(2)).  That requires "factual content" permitting "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal quotation omitted).

### B.    Overview of Law on Patent Eligibility

In *Alice*, the Supreme Court outlined a two-prong framework for determining whether claimed subject matter is patentable under § 101 for claiming an abstract idea.  First, a court must determine whether a claim is directed to an abstract idea.  *Alice*, 573 U.S. at 217, 221.  Second, if the claim is found to be directed to an abstract idea, the court must determine whether the claim includes an "inventive concept," that is, some additional element or combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* at 217-18.  If the claim lacks an inventive concept "sufficient to 'transform' the claimed abstract idea into a patent-eligible application," it is patent-ineligible and invalid under section 101.  *Id.* at 221 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*, 556 U.S. 66, 72, 79 (2012)).

"Patentability under 35 U.S.C. § 101 is a threshold legal issue…. properly raised at the pleading stage if it apparent from the face of the patent that the asserted claims are not directed to

eligible subject matter." *Recentive*, 2023 WL 6122495, at *4 (citing *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). When a complaint asserts a patent directed to ineligible subject matter, it fails to state a plausible claim for relief. *Id.* at *13; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1345 (Fed. Cir. 2014).

## IV.    ARGUMENT

Claim 1 of the '626 patent—the only claim identified in Count IV of MetaRail's Complaint[5]— fails both steps of *Alice* and therefore is patent ineligible under § 101.

### A.    *Alice* Step One: Claim 1 of the '626 Patent Is Directed to An Abstract Idea

The first step under *Alice* considers "the focus" of the claims—that is, "their character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). As part of this inquiry, courts may compare the claims to those previously analyzed in earlier decisions. *Id.* at 1351-54. Particularly with software claims, the analysis under step one "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea for which computers are invoked merely as a tool." *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022) ("*Zillow*").

Here, however, claim 1 of the '626 Patent does not recite any technological improvement in computer capabilities. Instead, as the Patent Office rightly reasoned during prosecution of the predecessor '378 Patent, "selecting a deep-linked ad based on a universal variable map and placing

---

[5] *See*, *e.g.*, *Buffalo Patents, LLC v. LogMeIn, Inc.*, No. 22-cv-1333-MN (D. Del. Aug. 2, 2023) (granting motion to dismiss because "the only asserted claim" in count was "patent ineligible"). *Compare with Buffalo Patents, LLC v. Spotify USA Inc.*, C.A. No. 22-1335-MN (D. Del. April. 10, 2023) (denying motion to dismiss as to ***same patent***: "[T]he Court finds it inappropriate to address at the motion to dismiss stage the patent eligibility of all claims of the '417 Patent, particularly where the operative pleading only asserts "at least Claim 38…'") (citing *Hantz Software, LLC v. Sage Intacct, Inc.*, No. 2022-1390, 2023 WL 2569956, at *1 (Fed. Cir. Mar. 20, 2023).

the ad on a page would be directed towards a method of organizing human activities, which is an example identified by the courts as an abstract idea." Ex. C at C-4.

### 1. Claim 1 Concerns Automating the Creation of Deep-Linked Ads to Obviate the Need for Manual Programming

Claim 1 of the '626 Patent instead covers nothing more than ***automating*** the process of generating and serving deep-linked ads. On its face, the claim concerns "***generating***, by a server computer, ***a deep-linked ad*** utilizing a universal variable map stored in a data store and accessible by the server computer, the universal variable map linking programming variables across multiple sites on the Internet and applications" such that a user device can be "***automatically***" sent from a first website or mobile device (i.e., providing the advertising service) to a second (i.e., the entity seeking to advertise and drive traffic). The specification reiterates that this activity—generating deep-linked ads[6]—was previously performed manually and that the inventors merely sought to expedite the generation of such ads by automating the process. But the Federal Circuit has consistently held that such automation is not patentable.

### a. The Specification Admits That Deep-Linked Ads Had Previously Existed and Were Created Manually

The '626 Patent admits that "deep-linked ad connections" were known in the art and traditionally had been "manually created by developing programmatic integrations between variables and fields on the publisher website and the advertiser website" using "manual programming" after "manually obtain[ing]" the relevant information (i.e., "field descriptors and variable names") from the publisher and advertiser. 3:16-25. The purported problem was simply

---

[6] Deep-linked ads themselves are targeted advertising, which itself is an unpatentable abstract idea. *See, e.g.*, *Free Stream Media Corp. v. Alphonsp Inc.*, 996 F.3d 1355, 1362 (Fed. Cir. 2021); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015); *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 886 (Fed. Cir. 2019) (finding claims directed to the use of persistent identifiers to implement targeted advertising ineligible).

that such "manual programming" was "time and resource intensive"—making deep-linked ads were less convenient and widespread than an automated solution would allow.  3:26-42.

The '626 Patent in general, and Claim 1 in particular, therefore addressed the purported "need for an ***automated way*** to generate deep-linked ads" ***to*** "spur rapid and much ***wider adoption of these kinds of ads,"*** thereby yielding "greater economic gains for a ***larger cross-section of publisher and advertiser sites."*** 3:36-42.  The claimed embodiments ostensibly "automate a new generation of ads on the Internet and mobile devices that have not been possible before without extensive human intervention and programming."  19:26-29.

In sum, Claim 1 automates existing human practices, as the inventors themselves admitted in a specification dating back to the original application as filed on November 30, 2011—years before the Supreme Court's *Alice* decision reshaped § 101 law.  *See*, *e.g.*, *OIP*, 788 F.3d at 1363 (citing specification's emphasis on automation as the purported "key distinguishing feature").

### b.    Following *Alice*, the Federal Circuit Has Repeatedly Held Automating Existing Human Processes to Be Abstract

As the Federal Circuit has repeatedly held after *Alice*, methods to automating existing human processes (here, generating deep-linked ads) are a "telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316-18 (Fed. Cir. 2021) (claims for data management tools "directed to a medley of [human] mental processes").

Taking a manual process and automating it is quintessentially an abstract idea.  *See*, *e.g.*, *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) (claims using computers to automate a loan application process previously performed manually invalid: "[M]ere automation of manual processes using generic computer components does not constitute a patentable improvement in computer technology."); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("With the exception of generic computer-

implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper."); *OIP*, 788 F.3d at 1363 (claims to "automat[ing] or otherwise mak[ing] more efficient traditional price-optimization methods" were abstract); *Mortg. Application Techs., LLC v. MeridianLink, Inc*., 839 F. App'x 520, 526 (Fed. Cir. Jan. 12, 2021) ("We have previously held that a process that can be and has been performed by humans without the use of a computer . . . is an abstract idea."); *NetSoc, LLC v. Match Grp., LLC*, 838 F. App'x 544, 548 (Fed. Cir. 2020) (findings ineligible claims "directed to the abstract idea of automating the conventional").

Indeed, just as in *SurgeTech, LLC v. Uber Techs. Inc*., C.A. No. 22-882-GBW, 2023 WL 7182200 (D. Del. Nov. 1, 2023) (J. Williams), claim 1 does not address a "technological problem," but instead one that by the '626 Patent's own admission was "one of human inefficiency that could be solved by automation." *Id*. at *5; *see also D & M Holdings Inc. v. Sonos, Inc*., 309 F. Supp. 3d 207, 214 (D. Del. 2018) ("automation of a process that can be (and has been) performed by humans" not patentable); *Nice Sys. Ltd. v. Clickfox, Inc*., 207 F. Supp. 3d 393, 399 (D. Del. 2016) ("Aside from the use of automation via generic computer components to increase efficiency, the salesman has just practiced the claimed method."), *aff'd*, 698 F. App'x 615 (Fed. Cir. 2017).

Claim 1 is indistinguishable from that which this Court addressed in *SurgeTech*. The representative claim there recited a "computer-implemented method of managing online bookings" which included steps of "linking…each item in the transportation services inventory with one of  a plurality of online distribution channels," "receiving" information from each channel, "processing" the information to derive a rating for each channel, "querying" the best rating across the channels, and based on the answer "adjusting" price information and "modifying, via the computerized network, the linkage" of items to the channels. *Id.* at *1-2.

Like the specification here, the *SurgeTech* specifications confirmed that the challenged claims did not address a "technological problem, but one of human inefficiency that could be solved by automation." *Id.* at 5.  For example, the *SurgeTech* specification described the purported invention as necessary because it was "practically impossible for [the retailers] to manage this inventory in multiple [c]hannels…" *Id.*  The '626 patent acknowledges the same: "This manual programming is a time and resource intensive activity that ***multiplies as the size of the network grows***…" 3:26-29.  But as this Court stressed, the scale of information on the Internet "does not render the issue of organizing and analyzing said information a technological problem." *SurgeTech,* 2023 WL 7182200, at *5; *see also Recentive*, 2023 WL 6122495, at *10 ("a human being incapable of matching processing speed does not make an abstract process patent-eligible.").

### 2. The "Universal Variable Map" At Best Concerns the Abstract Idea of Indexing and Translation—Not a Technological Improvement

Claim 1's "universal variable map" is not a technological improvement and does not alter the abstractness of the claim, as confirmed by the Patent Office's repeated rejections of MetaRail's earlier proposed claims in the ancestor '378 Patent.  *See supra* Sections II.B-C.  The map just translates "programming variables across multiple sites on the Internet and applications."  Such "cross-referenc[ing]" of information is "longstanding conduct that existed well before the advent of computers and the Internet." *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1327-28 (Fed. Cir. 2017) ("*Erie*") ("The claims are not focused on *how* usage of the XML tags alters the database in a way that leads to an improvement in the technology of computer databases.") (emphasis original).  Here, as in *Erie*, the "universal variable map" is merely "the abstract idea of creating an index and using that index to search for and retrieve data." *Id.*; *see also Sensormatic Elecs. v. Wyze Labs, Inc.*, 484 F. Supp. 3d 161, 167 (D. Del. 2020) ("The claimed 'dual encoding of system inputs' in claim 1…is drawn to the abstract idea of translating

information between different formats."), *aff'd*, 2021 WL 2944838 (Fed. Cir. July 14, 2021); *Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, C.A. No. 14-612-RGA, 2015 WL 5156526, at *2 (D. Del. Sept. 2, 2015) (claims invalid under § 101 as directed to "abstract idea of translation"), *aff'd*, 669 F. App'x 555 (Fed. Cir. 2016); *directPacket Rsch., Inc. v. Polycom Inc.*, 19-CV-03918, 2023 WL 6301066, at *6 (N.D. Cal. Sept. 26, 2023) ("[T]he translation of 'multimedia streams' using an intermediate protocol is readily analogized to the abstract idea of language translation.").

Tellingly, nothing in claim 1 specifies how the universal data map "improves the way a computer generates and distributes" deep-linked ads. *Int'l Bus. Machines Corp. v. Zynga Inc.*, 642 F. Supp. 3d 481, 490 (D. Del. 2022) (Williams, J.) ("*IBM*"). The fact that different websites may use different terminology (i.e., "programming variables" or "field identifiers") concerning the same concepts is no different from how newspapers and potential advertisers might use different terms for the same categories. Yet newspaper staffers nevertheless could (and did) ensure that ads from "car" sellers were targeted in the "Automotive" section whereas ads from "airlines" were placed in the "Travel" section—just like the '626 Patent admits deep-linking programmers created "programmatic integrations between variables and fields." 3:16-26. The claimed "universal variable map" does not improve computer functioning, but rather merely facilitates the above-discussed automated handling of an issue endemic to advertising long before the Internet existed. When publishers and advertisers use different terminology, someone (e.g., a programmer or sales representative) or something (e.g., an index such as the claimed "universal data map") must translate between the two. Such translation is a "fundamental economic practice long prevalent in our system of commerce"—not a patentable invention. *Alice*, 573 U.S. at 219.

Nor does Claim 1 require the data map to take any particular form; it simply must aggregate data (as illustrated in the tabular columns from the non-limiting Figure 1) from different websites.

14

*Cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) ("[T]he claims are not simply directed to *any* form of storing tabular data….") (emphasis original); *see also IBM*, 642 F. Supp. 3d at 490 (distinguishing *Enfish*: "The novel data structure in *Enfish* was required by the claims.  In contrast, the [asserted] claim language…are not directed to a specific data structure that improves the way a computer generates and distributes tailored promotions.").  "No special rules or details…are recited."  *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017).  And nothing in the claim improves the way "in which systems store and access data"; instead, the map merely exploits a computer's "ordinary capacity" to store information—obviating the need for programmers to collect and link data manually.  *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) (distinguishing *Enfish*).  Any increased speed, greater efficiency, and/or enhanced penetration of deep-linked ads comes not from the patented method itself, but rather the "capabilities of a general-purpose computer."  *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) ("While the claimed system and method certainly purport to accelerate the process of analyzing audit log data, the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself.").

Consistent with claim 1's lack of specificity, the specification notes that any "database" can constitute the universal variable map.  10:3-5 ("[O]ne example of the [the universal variable map] is implemented as variable database 530 shown in FIG. 5.").  To the extent ***other*** portions of the specification provide additional details concerning the map, claim 1 lacks any corresponding elements.  For example, while the specification describes certain "heuristics" for using the database (14:60-16:49), claim 1 lacks any such rules.  The disclosed examples indeed are "[n]on-limiting." 15:1-2.  Any argument relying on such heuristics would not be "tethered to" the asserted claim.  *SurgeTech*, 2023 WL 7182200, at *6 (quoting *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th

1355, 1364 (Fed. Cir. 2023)).  Instead, the "focus of the claims, therefore, remains at a high level on" the automated generation of deep-linked ads.  *Erie,* 850 F.3d at 1328.  Reciting the "universal variable map" as the chosen index, "with little more, does not change that conclusion."  *Id.*

### 3. The Remaining Claim Elements Likewise Concern Collecting and Analyzing Data—Not Any Technological Improvement

Aside from reciting the above-discussed map and the automated creation of deep-linked ads, claim 1 merely recites at a high level the collection, analysis and manipulation of data—not any patentable improvement in computer technology.  *See, e.g., Zillow,* 50 F.4th at 1378; *Elec. Power Grp.,* 830 F.3d at 1353.  In this regard, Claim 1 is analogous to the "computer-implemented method" this Court recently addressed in *Recentive*, 2023 WL 6122495, at *2.

The *Recentive* claims concerned "a computer-implemented method of dynamically generating a network map," including "receiving" a schedule of events, "generating" a network map based on the schedule, "automatically updating" the network map in real-time, and "using the network map to make determinations concerning events.  *Id.*  This Court found the claims directed to a "familiar class of claims directed to a patent-ineligible concept"—those that collect, analyze, and display information.  *Id.* at *9 (citing *Elec. Power Grp.*, 830 F.3d at 1353).

Here likewise, Claim 1's method includes "generating" deep-linked ads, which per the specification includes steps of data gathering—"extracting" in the claim's parlance—and archiving.  3:48-55.  Claim 1 also recites "automatically directing" users in real-time, which again necessarily includes steps of inferring and linking.  *Id.*  Claim 1 then recites using (or "passing") the information gleaned when generating the deep-linked ad to determine what should be presented to the user, which the specification describes as "programmatic use of dynamic data and the programming containers or variables for this dynamic data."  *Id.*  Like those in *Recentive*, claim 1 does not purport to "improve technical functioning," but merely "use a computer as a tool to"

"automat[e] the spidering or otherwise data gathering, archiving, inferring, linking and programmatic use of dynamic data and the programming containers or variables for this dynamic data" to generate deep-linked ads. *Recentive*¸ 2023 WL 6122495, at *9.

### B. *Alice* Step Two: Claim 1 Fails to Recite Any Inventive Concept

*Alice* step two concerns whether the challenged claim recites an "inventive concept" that "amounts to *significantly* more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18. "[C]onventional, routine and well understood applications" do not constitute an inventive concept. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015). Nor can an abstract idea itself provide an inventive concept. *PersonalWeb*, 8 F.4th at 1318. "To save a patent at step two," something ***beyond*** the abstract itself must be "evident in the claims" themselves—not merely in the specification. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); *IBM*, 642 F. Supp. 3d at 495 ("It is improper for IBM to point to unclaimed features of the '904 patent to support its *Alice* step two analysis.")

#### 1. Increased Speed and Efficiency is Immaterial

Here, however, claim 1 lacks anything material beyond the above-discussed abstract concepts of automatically generating deep-linked ads using a "universal variable map" and otherwise collecting and analyzing data. It is irrelevant whether the claimed invention generates such deep-linked ads more quickly than had historically been possible. *OIP*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

Claim 1 as issued instead closely tracks claim 25 of the application for the earlier '378 Patent ***before*** MetaRail extensively revised the claim to overcome the Patent Office's repeated § 101 rejections. *See supra* § II.C & Ex. H. It also closely tracks the challenged claims in *Recentive*, in which this Court emphasized that reciting "generic and conventional computing devices" are

insufficient to transform abstract ideas into patent-eligible subject matter.  2023 WL 6122495, at *12.  Just as it was undisputed that "Recentive did not invent machine learning," *id*., the '626 Patent admits MetaRail did not invent deep-linked ads, but instead merely sought to automate them to reap "new market efficiencies"—yielding "greater economic gains for a larger cross-section of publisher and advertiser sites," 3:36-42.  But such increased "speed and efficiency" does not suffice under *Alice* step two.  *Repifi Vendor Logistics, Inc. v. IntelliCentrics, Inc*., No. 2021-1906, 2022 WL 794981, at *3 (Fed. Cir. Mar. 15, 2022); *see also IBM*, 642 F. Supp. 3d at 494 ("increas[ing] the efficiency in creating marketing promotions" insufficient under *Alice* step two).

### 2.    Claim 1 is Fundamentally Different From Those At Issue in *DDR*

Nor can MetaRail evade § 101 by purported analogy to *DDR*, which concerned fundamentally different claims addressing "a problem specifically arising in the realm of computer networks" (the threat of website visitors being lured away by "clicking on an advertisement and activating a hyperlink") and solving it with a technological solution that ***altered*** "the routine, conventional functioning of Internet hyperlink protocol."  773 F.3d at 1257.

Here, unlike *DDR*, the claimed method of generating and serving deep-linked ads uses ordinary networking technology.  Automated deep-linked ads yield the same "routine and conventional result that one would obtain when manually" programming such ads.  *D&M Holdings Inc. v. Sonos, Inc*., C.A. No. 16-141-RGA, 2017 WL 1395603, at *10 (D. Del. Apr. 18, 2017).  The inventors merely automated the creation process to increase efficiency.  3:16-47.  And they stressed that any conventional components could be used to do so.  *E.g*., 21:18-21 ("***any medium***…"); 21:44-46 ("***any, hardware system, mechanism or component*** that processes data, signals or other information").  These conventional components are "simply doing something ***on*** a web page" (namely, placing deep-linked ads) rather than "doing something ***to*** a web page" (for example, altering conventional hyperlink protocols).  *Affinity Labs of Texas, LLC v. DIRECTV,*

*LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) ("*DDR Holdings* dealt with a patent that required doing something *to* a web page, not simply doing something *on* a web page, a difference that the court regarded as important to the issue of patent eligibility.") (emphasis original).

The ostensible problem the '612 Patent solved was not how to make computers perform differently, but instead how to navigate between publishers and advertisers who used different terms (e.g., "automotive" versus "car") to describe the same concepts. But "maintaining data from multiple sources and organizing it" is a "problem that is ***not*** unique to technology." *SurgeTech*, 2023 WL 7182200 at \*5 (distinguishing *DDR*). Navigating terminological differences instead is "an inherent part of any" relationship between publishers and advertisers. *Intellectual Ventures I LLC v. AT & T Mobility LLC*, 235 F. Supp. 3d 577, 591 (D. Del. 2016) (distinguishing *DDR* and holding that challenged claim failed to satisfy *Alice* step two: "[T]he problem is an inherent part of any provision of services, regardless of whether the services are computer-based.").

In sum, Claim 1 "neither provides a specific solution nor addresses a problem unique to the Internet." *MG Freesites Ltd. v. ScorpCast LLC*, 651 F. Supp. 3d 744, 754–55 (D. Del. 2023) ("[T]he need to tag information for ease of reference pre-dates the Internet."). It is immaterial that the '626 Patent discusses terminological differences in the "Internet-centric" ***context*** of deep-linked ads. *DDR*, 773 F.3d at 1258 ("[N]ot all claims purporting to address Internet-centric challenges are eligible for patent."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (affirming motion to dismiss complaint asserting claims to Internet-based advertising: "[U]se of the Internet does not transform an otherwise abstract idea into patent-eligible subject matter."). Put differently, as this Court did in *Surgetech*, "just because the Internet permits" deep-linked ads as a marketing strategy does not mean that that navigating terminology differences on the Internet is a "technological problem." *Surgetech*, 2023 WL 7182200, at \*5 (collecting cases).

*DDR* is therefore inapposite—just as the Patent Office stressed when rejecting analogous claims in the predecessor '378 Patent application because MetaRail's "methodology for targeted personalized advertising" worked "through the normal operation of the Internet" rather than changing such operations as the *DDR* claims had specified.  Ex. E at E-4; *see also supra* § II.B.[7]

### C.    Amendment of The Challenged Count is Futile

Given that the language of claim 1 is fixed, any amendment of the Complaint would be futile and MetaRail accordingly should not be granted leave to amend.  *Recentive*, 2023 WL 6122495, at *13 (denying leave to amend where "[t]he claims of the patents say what they say").

## V.    CONCLUSION

For the reasons stated above, Google LLC respectfully requests that the Court dismiss Count IV of the Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

---

[7] The subsequent reference to *DDR* during prosecution of the '626 Patent merits no deference, particularly given the inconsistency with the thoroughly reasoned analysis during examination of the earlier '378 Patent.  *See Recentive*, 2023 WL 6122495, at *6 ("[C]ourts in this District have previously confronted the PTO's examples and declined to defer to their findings or conclusions.")

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gregory F. Corbett
Charles T. Steenburg
Marie A. McKiernan
Jie Xiang
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Tel: (617) 646-8000

Elizabeth A. DiMarco
John W. McGrath
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 571-5001

Dated:  December 15, 2023
11213770 / 12599.00061

By:  */s/ David E. Moore*
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Andrew M. Moshos (#6685)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com
     amoshos@potteranderson.com

*Attorneys for Defendant Google LLC*