**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| METARAIL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-1116-GBW |
| v. | ) | |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT GOOGLE LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

OF COUNSEL:

Gregory F. Corbett
Charles T. Steenburg
Marie A. McKiernan
Jie Xiang
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Tel: (617) 646-8000

Elizabeth A. DiMarco
John W. McGrath
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 571-5001

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew M. Moshos (#6685)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Defendant Google LLC*

Dated: January 26, 2024
11291498 / 12599.00061

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Claim 1 of the ’626 Patent is Directed to Deep-Linked Ads—Which the Patent Admits Were Already Known in the Prior Art—and Using a Universal Variable Map to Automate Placement of Such Ads .......... 2

B. The Patent Office Repeatedly Determined that Reciting a Universal Data Map Did Not Render Deep-Linking Claims Patentable During Prosecution of the Earlier ’378 Patent to Which the ’626 Patent Claims Priority .......... 5

C. Claim 1 of the ’626 Patent Closely Tracks Claim 1 of the ’378 Patent Before the Extensive Amendments the Patent Office Required For Allowance .......... 6

III. LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER § 101 .......... 7

IV. ARGUMENT .......... 7

A. *Alice* Step One: Claim 1 of the ’626 Patent Is Directed to An Abstract Idea .......... 8

1. Claim 1 Concerns Automating the Creation of Deep-Linked Ads to Obviate the Need for Manual Programming .......... 8

a. The Specification Admits and the FAC Confirms That Deep-Linked Ads Had Previously Existed and Were Created Manually .......... 9

b. Following *Alice*, the Federal Circuit Has Repeatedly Held Automating Existing Human Processes to Be Abstract .......... 10

c. The “Universal Variable Map” Concerns the Abstract Idea of Indexing and Translation—Not a Technological Improvement .......... 12

2. The Remaining Claim Elements Likewise Concern Collecting and Analyzing Data—Not Any Technological Improvement .......... 15

B. *Alice* Step Two: Claim 1 Fails to Recite Any Inventive Concept .......... 17

1. Increased Speed and Efficiency is Immaterial .......... 17

2. Claim 1 is Fundamentally Different From Those At Issue in *DDR* .......... 18

C. Amendment of The Challenged Count is Futile .......... 20

V. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## CASES

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) .......... 19

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014).......... passim

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
967 F.3d 1285 (Fed. Cir. 2020) .......... 14

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) .......... 17

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) .......... 14

*Buffalo Patents, LLC v. LogMeIn, Inc.*,
C.A. No. 22-cv-1333 (D. Del. Aug. 2, 2023) .......... 7

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017) .......... 10

*D & M Holdings Inc. v. Sonos, Inc.*,
309 F. Supp. 3d 207 (D. Del. 2018).......... 11

*D&M Holdings Inc. v. Sonos, Inc.*,
C.A. No. 16-141, 2017 WL 1395603 (D. Del. Apr. 18, 2017).......... 18

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 6, 18, 19, 20

*directPacket Rsch., Inc. v. Polycom Inc.*,
19-CV-03918, 2023 WL 6301066 (N.D. Cal. Sept. 26, 2023).......... 13

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) .......... 8, 15

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .......... 14

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) .......... 8, 15, 16

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
No. 2022-1861, 2024 WL 89642 (Fed. Cir. Jan. 9, 2024).......... 7

*Int'l Bus. Machines Corp. v. Zynga Inc.*,
642 F. Supp. 3d 481 (D. Del. 2022)............................................................ 13, 14, 17, 18

*Intellectual Ventures I LLC v. AT & T Mobility LLC*,
235 F. Supp. 3d 577 (D. Del. 2016)........................................................................... 19

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017) ...................................................................... 12, 15

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ........................................................................... 10

*IPA Techs., Inc. v. Amazon.com, Inc.*,
352 F. Supp. 3d 335 (D. Del. 2019)........................................................................... 18

*Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*,
556 U.S. 66 (2012)............................................................................................. 7

*MG Freesites Ltd. v. ScorpCast LLC*,
651 F. Supp. 3d 744 (D. Del. 2023)........................................................................... 19

*Nice Sys. Ltd. v. Clickfox, Inc.*,
207 F. Supp. 3d 393 (D. Del. 2016), *aff'd*,
698 F. App'x 615 (Fed. Cir. 2017) ........................................................................ 11

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*,
C.A. No. 14-612, 2015 WL 5156526 (D. Del. Sept. 2, 2015), *aff'd*,
669 F. App'x 555 (Fed. Cir. 2016) ........................................................................ 13

*OIP Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) ................................................................ 10, 11, 17

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ........................................................................ 10, 17

*Recentive Analytics, Inc. v. Fox Corp.*,
C.A. No. 22-1545, 2023 WL 6122495 (D. Del. Sept. 19, 2023)...................................... passim

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017) ........................................................................... 17

*Repifi Vendor Logistics, Inc. v. IntelliCentrics, Inc.*,
No. 2021-1906, 2022 WL 794981 (Fed. Cir. Mar. 15, 2022).................................................. 18

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ................................................................... 7, 14, 20

*Sensormatic Elecs. v. Wyze Labs, Inc.*,
484 F. Supp. 3d 161 (D. Del. 2020), *aff'd*,
2021 WL 2944838 (Fed. Cir. July 14, 2021)........................................................................ 12

*SurgeTech, LLC v. Uber Techs. Inc.*,
C.A. No. 22-882, 2023 WL 7182200 (D. Del. Nov. 1, 2023) ................................ 11, 12, 14, 19

*Tenaha Licensing LLC v. Tigerconnect, Inc.*,
C.A. No. 19-1400, 2020 WL 30426 (D. Del. Jan. 2, 2020)..................................................... 20

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023) ........................................................................................... 14, 17

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ................................................................................................ 16

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) .................................................................................................. 19

*VideoShare, LLC v. Google, Inc.*,
C.A. No. 13-CV-990, 2016 WL 4137524 (D. Del. Aug. 2, 2016), *aff'd*,
695 F. App'x 577 (Fed. Cir. 2017)............................................................................................ 10

**STATUTES**

35 U.S.C. § 101.................................................................................................................. passim

**RULES**

Fed. R. Civ. P. 12(b)(6)................................................................................................................ 21

**TABLE OF EXHIBITS TO THE FIRST AMENDED COMPLAINT (D.I. 15)**
**CITED HEREIN**

| Exhibit Number | Description |
|---|---|
| FAC Ex. B | U.S. Patent No. 9,633,378 ("'378 Patent") |
| FAC Ex. H | U.S. Patent No. 10,789,626 ("'626 Patent") [subject of Google's motion to dismiss] |
| FAC Ex. J | File History of the '378 Patent |

**TABLE OF EXHIBITS IN THE DECLARATION OF MARIE A. MCKIERNAN**
**CITED AND FILED HEREWITH**[1]

| Exhibit Number | Description |
|---|---|
| McKiernan Ex. A | Comparison of Claim 1 of the '626 Patent as Issued (including Redlines Illustrating Amendments to Overcome § 101 Rejection) with Claim 1 of the '378 Patent Application as Originally Filed |
| McKiernan Ex. B | May 28, 2020 Notice of Allowability During Prosecution of the '626 Patent |
| McKiernan Ex. C | Specification of the Application for the '626 Patent as filed |

[1] Exhibits referenced in this memorandum originate in two places. First, Google cites exhibits attached to Plaintiff's First Amended Complaint ("FAC Ex."), which are identified by ECF page number herein. In addition, Google cites to exhibits attached to the Declaration of Marie A. McKiernan filed herewith ("McKiernan Ex."). Citations to these exhibits are identified by the endorsed PDF pagination reflected on the bottom of each of the documents filed with the Court.

## I. INTRODUCTION

Count IV of MetaRail's First Amended Complaint (D. I. 15) ("FAC") fails to state a claim upon which relief may be granted because the only identified claim in Count IV—Claim 1 of U.S. Patent No. 10,789,626 ("'626 Patent") fails to recite patent-eligible subject matter under 35 U.S.C. § 101.[2] Claim 1 concerns "deep-linked" advertisements, which the '626 Patent also describes as "parameter-based" advertising, where parameters that a user is searching for are used to target ad placement and land the search user "deep" into the advertiser's web site or application.

The '626 Patent admits that such "parameter-based" deep-linked ads were used in Internet marketing campaigns before the purported invention. The ostensible innovation was ***automating*** the placement of the deep-linked ads rather than relying on manual programming. But the Federal Circuit has consistently held that automating known processes does not satisfy § 101. The claimed "universal variable map" underlying the automation embodies the abstract idea of translating from one set of terms to another—a fundamental practice since the dawn of advertising. Claim 1 offers no detail regarding the map aside from reciting that it "link[s] programming variables across multiple sites on the Internet and applications." But this merely restates the abstract idea of translation. Nothing in the claim specifies any technological improvement in how computers or networks function. The recited "deep-linked ads" operate the same way—using existing Internet protocols—as earlier deep-linked ads that the '626 Patent admits were already in commerce.

Following Google's motion to dismiss (D.I. 9), MetaRail filed the FAC, which merely added a "Background" section (¶¶10-31). The new content largely parrots the '626 Patent, further confirming that Claim 1 automates a known process using the abstract idea of translating between different terms. The FAC does not identify any new technology in Claim 1 for such translation.

---

[2] Nothing herein limits Google's rights to pursue additional Section 101 challenges.

MetaRail's new allegations are even ***internally*** inconsistent. For example, MetaRail makes much of pre-populating forms (*e.g.*, FAC, ¶¶27-28)—notwithstanding the intrinsic record's stress that "pre-populating" values was "well-known and conventional" (FAC Ex. J at 147, 491). Yet MetaRail also highlights purported admissions from Google about the supposed "technological advancement" underlying MetaRail's claims (FAC, ¶31)—even though the cited Google materials concern deep-linked ads generically and say nothing about pre-population. MetaRail's citations reiterate that '626 Patent Claim 1 just automates pre-existing processes using pre-existing tools.

## II. BACKGROUND

### A. Claim 1 of the '626 Patent is Directed to Deep-Linked Ads—Which the Patent Admits Were Already Known in the Prior Art—and Using a Universal Variable Map to Automate Placement of Such Ads

The '626 Patent[3] purportedly facilitates "deep-linked ads" by automating their placement. 3:16-20 ("So far in the industry, these deep-linked ad connections have been manually created...").

Deep-linked ads "fast-forward" Internet users "deep" within advertisers' websites (as opposed to the advertisers' home pages)—yielding better "conversion rates" because users find themselves much further along the purchase or "booking process." 3:1-10. For example, if a user searches "flight rates from London to Amsterdam March 13," the publisher of the site may provide a deep link to a partner airline's "page where the user can purchase a flight ticket to travel by air from London to Amsterdam on March 13." 17:64-18:25. The user, in other words, is "fast-forward[ed]" deep within the advertiser's "conversion funnel," improving return-on-investment for the advertiser as compared with other forms of click ads. 3:1-10.

The '626 Patent does not allege that deep-linked ads themselves are patentable. Such ads instead are nothing more than the information-age equivalent of a full-service travel agent who

---

[3] Unless indicated, citations are to the '626 Patent (FAC Ex. H), emphasis is added, and internal quotations are omitted.

coordinates with airlines rather than relying on customers to start the reservation process by calling the main number and explaining their desired itineraries. Instead, the ’626 Patent notes that creating deep-linked ads had traditionally been a "time and resource intensive activity that multiplies as the size of the network grows" given that:

> [traditional] deep-linked ad connections have been manually created by developing programmatic integrations between variables and fields on the publisher web site and the advertiser web site, created by manual code…[E]ach web site uses its own field descriptors and variable names, and the only way to create deep-linked ads has been to manually obtain the names of the respective variables from both publishers and advertisers and then integrate them [with] manual programming.

(3:17-27; FAC ¶13). Given this purported problem, the inventors sought to take the existing concept (i.e., deep-linked ads) and make it more scalable by creating "accurate mappings ***without any human intervention***." 13:65-14:2. The ’626 Patent identifies an alleged "need for an automated way to generate deep-linked ads" to promote "***wider adoption*** of these kinds of ads by ***increasing numbers*** of participating web sites," thus creating "***market efficiencies***" and yielding "***greater economic gains*** for a ***larger cross-section*** of...sites." 3:36-42.

To this end, the ’626 Patent discloses embodiments "for automating the spidering or otherwise data gathering, archiving, inferring, linking and programmatic use of dynamic data and the programming containers" from websites and mobile applications. 3:48-55. The specification describes various techniques for such data generation, including "[c]reat[ing] a list of all the verticals," "[g]enerat[ing] lists of web sites belonging in" such verticals," "[r]unning asynchronous spiders," "[n]ormaliz[ing]" the relevant variables, "[c]reat[ing] mini-integrations or handshakes," "gathering the dynamic landing page URL…as opposed to a static home page," and "run[ning] processes to continually validate, update and fine-tune the data gathering." 4:21-5:3.

However, Claim 1 of the ’626 Patent does not recite any specific such techniques. Instead it tracks Figure 3 of the patent, which recites only three high-level concepts; (1) "Create and

Maintain Universal Map," (2) "Automatically Generate Deep-Linked Ads," and (3) "Present Deep-Linked Ads to E-Commerce Consumers in Real Time":

| **Figure 3** | **Claim 1 – "A method, comprising:** |
|---|---|
| "Create and Maintain **Universal Map**" | generating, by a server computer, a **deep-linked ad** utilizing a **universal variable map** stored in a data store and accessible by the server computer, the **universal variable map** linking programming variables across multiple sites on the Internet and applications; |
| "**Automatically** Generate **Deep-Linked Ads**" | serving, by the server computer, the **deep-linked ad** through a first site or mobile application, the **deep-linked** ad linking a first set of programming variables of the first site on the Internet or the first mobile applications with a second set of programming variables being associated with the second set of programming variables in the **universal variable map** stored in the data store; |
| "Present **Deep-Linked Ads** to E-Commerce Consumers in **Real Time**" | and in response to a user interacting with the **deep-linked ad** displayed on a user device through an instance of the first site on the Internet or the first mobile application:<br><br>extracting, through the first site on the Internet or the first mobile application, values corresponding to the first set of programming variables;<br><br>**automatically** directing the user device to the second site on the Internet or the second mobile application; and<br><br>passing the values corresponding to the first set of programming variables to the second set of programming variables such that one or more fields corresponding to the second set of programming variables of the second site on the Internet or the second mobile application are explicitly or implicitly pre-populated with the values extracted through the first site on the Internet or the first mobile application. |

Other than the concept of automating the known generation of deep-linked ads, Claim 1 reduces to the concept of a "universal data map" linking programming variables from two different websites or mobile applications. This "map" ostensibly obviates the need for "programmatic integrations between variables and fields on the publisher web site and the advertiser web site, created by manual code." 3:16-20. Put differently, the map ***translates*** between different terminology to speed up the automation, as Table 1 exemplifies:

| Web Sites | xxx.com | yyy.net | zzz.org | . . . | Normalized Variables |
|---|---|---|---|---|---|
| Variable 1 | Orig | Depart_City | From | . . . | from |
| Variable 2 | Dest | Arrival_City | To | . . . | to |
| Variable 3 | . . . | . . . | . . . | . . . | . . . |
| . . . | . . . | . . . | . . . | . . . | . . . |

10:10-19. MetaRail's FAC concedes the same: "while three different websites have different ways in which they identify programming dynamic input fields" (FAC ¶22), the variables are then "indexed to their normalized versions…allowing for automatic and optimized generation of deep-linked ads." FAC ¶24. The '626 Patent stresses that such mapping itself enables scalability. 14:54-56. But it never defines any specific form the map must take. Table 1 is merely "[a] non-limiting example." 10:9-10. Claim 1 likewise recites the map in purely functional terms: it translates between "programming variables across multiple sites on the Internet and applications."

### B. The Patent Office Repeatedly Determined that Reciting a Universal Data Map Did Not Render Deep-Linking Claims Patentable During Prosecution of the Earlier '378 Patent to Which the '626 Patent Claims Priority

The '626 Patent claims priority to U.S. Patent No. 9,633,378 ("'378 Patent) (FAC Ex. B). During prosecution of the '378 Patent, the Patent Office ("PTO") repeatedly rejected the pending claims under § 101. The PTO rejected MetaRail's original claims (FAC Ex. J. 355)—to "automatically generating a deep-linked ad" using a "universal variable map"—as "directed to…the abstract idea of mapping programming containers and serving ads." *Id*. at 283. The PTO likewise cited § 101 when rejecting new claims MetaRail entered to replace the original claim set:

> ***[T]he concept of selecting a deep-linked ad based on a universal variable map and placing the ad on a page would be directed towards a method of organizing human activities***, which is an example identified by the courts as an abstract idea. Further, the claims are essentially directed to using categories to organize, store, and transmit information (i.e. mapping field identifiers and generating an ad based on the mapping).

*Id.* at 202. The PTO stressed that none of the added limitations amounted to significantly more than the abstract idea. For example, "obtaining field identifiers" was "mere data gathering," and

"pre-populating values" was "well-understood and conventional." *Id.* at 203.

MetaRail unsuccessfully tried contesting this rejection and analogizing the pending claims to those found eligible in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). FAC Ex. J at 183-184 (asserting that "claimed invention solved a problem specific to the realm of Internet"). The PTO rejected the analogy, as MetaRail's claimed "methodology" worked "through the normal operation of the Internet." *Id*. at 146-147. The claimed universal variable map" constituted "well-known and conventional computer functions." *Id*. at 153. Nor did it matter that the claims also recited "passing values from one site or application or pre-populating data entry fields based on previous user input"—that was "well-known and conventional." *Id*. at 152.

MetaRail never contested the PTO's findings, but instead negotiated to secure narrower claims in the '378 Patent with additional limitations such as "enhancing rules to enhance results of the obtaining of [a] plurality of computer-readable field identifiers." *Id*. at 30-38.

### C. Claim 1 of the '626 Patent Closely Tracks Claim 1 of the '378 Patent Before the Extensive Amendments the Patent Office Required For Allowance

As illustrated in McKiernan Exhibit A, Claim 1 of the '626 Patent resembles claim 25 of the ***application*** for the earlier '378 Patent—***before*** the extensive amendments MetaRail made to overcome the PTO's repeated § 101 rejections. Inexplicably, however, the PTO did not issue a § 101 rejection during prosecution of the '626 Patent. Instead, a Notice of Allowability was issued after MetaRail overcame a double patenting rejection. McKiernan Ex. B at B-1-B-11.

Citing paragraphs 9-11 of the specification as-filed, the Notice of Allowability suggested that the "[c]laims overcome problems with previously used techniques for online deep-linked ad connections." *Id.* at B-7. But these paragraphs (3:7-4:17) merely discuss the desirability of "automating" the previous "manual" programming process—which the PTO emphasized was *not* analogous to the claims in *DDR* during prosecution of the '378 Patent. *See supra* §§ II.A-B.

## III. LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER § 101

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014) outlines a two-prong framework for determining whether claimed subject matter is patentable under § 101. First, a court must determine whether a claim is directed to an abstract idea. *Id.* at 217, 221. Second, in such a case, the court must determine whether the claim includes an "inventive concept," that is, some additional element or combination of elements "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217-18. If the claim lacks an inventive concept "sufficient to 'transform' the claimed abstract idea into a patent-eligible application," it is patent-ineligible and invalid under section 101. *Id.* at 221 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*, 556 U.S. 66, 72, 79 (2012)).

"Patentability under 35 U.S.C. § 101 is a threshold legal issue…. properly raised at the pleading stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter." *Recentive Analytics, Inc. v. Fox Corp.*, C.A. No. 22-1545, 2023 WL 6122495, at *4 (D. Del. Sept. 19, 2023) (J. Williams). The Court "need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification." *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017). Nor does the Court need to accept allegations that "merely alleg[e] inventiveness without tying those allegations to the patent." *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, No. 2022-1861, 2024 WL 89642, at *5 (Fed. Cir. Jan. 9, 2024).

## IV. ARGUMENT

Claim 1 of the '626 Patent—the only claim[4] identified in Count IV of MetaRail's FAC—fails both steps of *Alice* and therefore is patent ineligible under § 101.

[4] *See, e.g., Buffalo Patents, LLC v. LogMeIn, Inc.*, C.A. No. 22-cv-1333 (D. Del. Aug. 2, 2023).

### A. *Alice* Step One: Claim 1 of the '626 Patent Is Directed to An Abstract Idea

The first step under *Alice* considers "the focus" of the claims—that is, "their character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). As part of this inquiry, courts may compare the claims to those previously analyzed in earlier decisions. *Id*. at 1351-54. Particularly with software claims, the analysis under step one "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea for which computers are invoked merely as a tool." *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022) ("*Zillow*").

Here, however, Claim 1 of the '626 Patent does not recite any technological improvement in computer or network capabilities. Instead, as the PTO rightly reasoned during prosecution of the predecessor '378 Patent, "selecting a deep-linked ad based on a universal variable map and placing the ad on a page would be directed towards a method of organizing human activities, which is an example identified by the courts as an abstract idea." FAC Ex. J at 202.

#### 1. Claim 1 Concerns Automating the Creation of Deep-Linked Ads to Obviate the Need for Manual Programming

Claim 1 of the '626 Patent instead covers nothing more than ***automating*** the process of generating and serving deep-linked ads—automation achieved with the abstract idea of translating between different terms used by different websites. The claim concerns "***generating***, by a server computer, ***a deep-linked ad*** utilizing a universal variable map stored in a data store and accessible by the server," with the "map linking programming variables across multiple sites on the Internet and applications" such that a user device can be "***automatically***" sent from a first site to a second.

The specification reiterates that this activity—generating deep-linked ads—was previously performed manually and that the inventors merely sought to expedite the generation of such ads

by automating the process. The FAC confirms the same. But the Federal Circuit has consistently held that such automation is not patentable.

#### a. The Specification Admits and the FAC Confirms That Deep-Linked Ads Had Previously Existed and Were Created Manually

The ’626 Patent admits that “deep-linked ad connections” were known in the art and traditionally had been “manually created by developing programmatic integrations between variables and fields on the publisher website and the advertiser website” using “manual programming” after “manually obtain[ing]” the relevant information (i.e., “field descriptors and variable names”) from the publisher and advertiser. 3:16-25; FAC ¶13. The purported problem was simply that “manual programming” was “time and resource intensive”—making deep-linked ads less convenient and widespread than an automated solution would allow. 3:26-42; FAC ¶13.

The ’626 Patent in general, and Claim 1 in particular, therefore addressed the purported “need for an ***automated way*** to generate deep-linked ads” ***to*** “spur rapid and much ***wider adoption of these kinds of ads,”*** thereby yielding “greater economic gains for a ***larger cross-section of publisher and advertiser sites.”*** 3:36-42. The claimed embodiments ostensibly “automate a new generation of ads on the Internet and mobile devices that have not been possible before without extensive human intervention and programming.” 19:26-29; FAC ¶17.

MetaRail’s FAC admits the same—the purported change to “infrastructure” (FAC ¶14) was nothing more than automating previously manual processes:

| | **Manual Programming (3:16-25)** | **’626 Programming (FAC ¶14)** |
|---|---|---|
| **How** | “developing programmatic ***integrations*** | “mapping and ***integrating*** |
| **What** | between ***variables*** and ***fields*** | ***field*** identifiers or programming ***variables*** …with the corresponding… ***fields*** or ***variables*** |
| **Where** | on the ***publisher web site*** and the ***advertiser web site***” | on the ***publisher site*** or mobile app…. [and] on the ***advertiser site*** or mobile app” |

MetaRail's own characterizations highlight how Claim 1 of the '626 Patent "merely automate[s] a sequence of known steps using conventional technology so that a human is not burdened with various manual steps." *VideoShare, LLC v. Google, Inc.*, C.A. No. 13-CV-990, 2016 WL 4137524, at *7 (D. Del. Aug. 2, 2016), *aff'd*, 695 F. App'x 577 (Fed. Cir. 2017). And MetaRail's other allegations to the contrary (*e.g.*¸ FAC ¶¶10, 21 (describing patent as "novel"); ¶14 (asserting that patent "transformed the structure of Internet advertising")) "are the sort[] of mere conclusory statements that a Court may disregard at the 12(b)(6) stage." *Recentive*, 2023 WL 6122495, at *5.

In sum, Claim 1 automates existing human practices, as the inventors themselves admitted in a specification dating back to the original application filed on November 30, 2011 (*see* Sec. II.C.)—years before the Supreme Court's *Alice* decision reshaped § 101 law. *See, e.g.*, *OIP Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (finding unpatentable a patent whose specification's emphasis on automation was the purported "key distinguishing feature").

#### b. Following *Alice*, the Federal Circuit Has Repeatedly Held Automating Existing Human Processes to Be Abstract

As the Federal Circuit has repeatedly held after *Alice*, methods to automate existing human processes (here, generating deep-linked ads) are a "telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316-18 (Fed. Cir. 2021) ("*PersonalWeb*") (claims for data management tools "directed to a medley of [human] mental processes").

Taking a manual process and automating it is quintessentially an abstract idea. *See, e.g.*, *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) (claims using computers to automate application process previously performed manually invalid: "[M]ere automation of manual processes using generic computer components does not constitute a patentable improvement in computer technology."); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("With the exception of generic computer-

implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human"); *OIP*, 788 F.3d at 1363 (claims to "automat[ing] or otherwise mak[ing] more efficient traditional price-optimization methods" were abstract).

Indeed, just as in *SurgeTech, LLC v. Uber Techs. Inc.*, C.A. No. 22-882, 2023 WL 7182200 (D. Del. Nov. 1, 2023) (J. Williams), Claim 1 does not address a "technological problem," but instead one that by the '626 Patent's own admission was "one of human inefficiency that could be solved by automation." *Id.* at *5; *see also D & M Holdings Inc. v. Sonos, Inc.*, 309 F. Supp. 3d 207, 214 (D. Del. 2018) ("automation of a process that can be (and has been) performed by humans" not patentable); *Nice Sys. Ltd. v. Clickfox, Inc.*, 207 F. Supp. 3d 393, 399 (D. Del. 2016) (finding unpatentable a patent claiming "automation via generic computer components to increase efficiency"), *aff'd*, 698 F. App'x 615 (Fed. Cir. 2017).

Claim 1 is indistinguishable from that which this Court addressed in *SurgeTech*. The representative claim there recited a "computer-implemented method of managing online bookings" which included steps of "linking…each item in the transportation services inventory with one of a plurality of online distribution channels," "receiving" information from each channel, "processing" the information to derive a rating for each channel, "querying" the best rating across the channels, and based on the answer "adjusting" price information and "modifying, via the computerized network, the linkage" of items to the channels. 2023 WL 7182200 at *1-2.

Like the specification here, the *SurgeTech* specifications confirmed that the challenged claims did not address a "technological problem, but one of human inefficiency that could be solved by automation." *Id.* at *5. For example, the *SurgeTech* specification described the purported invention as necessary because it was "practically impossible for [the retailers] to manage this inventory in multiple [c]hannels…" *Id.* The '626 Patent acknowledges the same:

"This manual programming is a time and resource intensive activity that ***multiplies as the size of the network grows***…" 3:26-29. But as this Court stressed, the scale of information on the Internet "does not render the issue of organizing and analyzing said information a technological problem." *SurgeTech*, 2023 WL 7182200, at *5; *see also Recentive*, 2023 WL 6122495, at *10 ("a human being incapable of matching processing speed does not make an abstract process patent-eligible.").

**c. The "Universal Variable Map" Concerns the Abstract Idea of Indexing and Translation—Not a Technological Improvement**

Claim 1's "universal variable map" is not a technological improvement and does not alter the abstractness of the claim, as confirmed by the PTO's repeated rejections of MetaRail's earlier proposed claims in the '378 Patent. *See* Sec. II.B-C. The map just translates "programming variables across multiple sites on the Internet and applications." '626 Patent, Claim 1; FAC ¶¶14, 29. As MetaRail admits, the map "is accessed to cross reference programming variables used by the search engine… and those used by the search site…"[5] FAC ¶23. But such "cross-referenc[ing]" of information is "longstanding conduct that existed well before the advent of computers and the Internet." *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1327-28 (Fed. Cir. 2017) ("*Erie*") (invalidating claims "not focused on *how* usage of the XML tags" improved "the technology of computer databases.") (emphasis original).

Here, as in *Erie*, the "universal variable map" is merely "the abstract idea of creating an index and using that index to search for and retrieve data." *Id.*; *see also Sensormatic Elecs. v. Wyze Labs, Inc.*, 484 F. Supp. 3d 161, 167 (D. Del. 2020) ("The claimed 'dual encoding of system inputs' …is drawn to the abstract idea of translating information between different formats."),

[5] MetaRail uses various terms to describe this cross-referencing (*see e.g.*, FAC ¶22 ("normalize"); ¶23 ("cross-reference"); ¶24 ("index"); ¶¶28-29 ("link"); ¶30 ("mapping and integrating")). But all are simply other ways to denote translating data.

*aff'd*, 2021 WL 2944838 (Fed. Cir. July 14, 2021); *Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, C.A. No. 14-612, 2015 WL 5156526, at *2 (D. Del. Sept. 2, 2015) (claims invalid under § 101 as directed to "abstract idea of translation"), *aff'd*, 669 F. App'x 555 (Fed. Cir. 2016); *directPacket Rsch., Inc. v. Polycom Inc.*, 19-CV-03918, 2023 WL 6301066, at *6 (N.D. Cal. Sept. 26, 2023) ("[T]he translation of 'multimedia streams' using an intermediate protocol is readily analogized to the abstract idea of language translation.").

Tellingly, nothing in Claim 1 specifies ***how*** the universal data map "improves the way a computer generates and distributes" deep-linked ads. *Int'l Bus. Machines Corp. v. Zynga Inc.*, 642 F. Supp. 3d 481, 490 (D. Del. 2022) (Williams, J.) ("*IBM*"). The fact that different websites may use different terminology (i.e., "programming variables" or "field identifiers") concerning the same concepts is no different from how newspapers and potential advertisers might use different terms for the same categories. Yet newspaper staffers nevertheless could (and did) ensure that ads from "car" sellers were targeted in the "Automotive" section whereas ads from "airlines" were placed in the "Travel" section—just like the '626 Patent admits deep-linking programmers created "programmatic integrations between variables and fields." 3:16-26. The claimed "universal variable map" does not improve computer functioning, but rather merely facilitates the above-discussed automated handling of an issue endemic to advertising long before the Internet existed. When publishers and advertisers use different terminology, someone (e.g., a programmer or sales representative) or something (e.g., an index such as the claimed "universal data map") must translate between the two. 3:7-25. Such translation is a "fundamental economic practice long prevalent in our system of commerce"—not a patentable invention. *Alice*, 573 U.S. at 219.

Nor does Claim 1 require the data map to take any particular form; it simply must aggregate data (as illustrated in the tabular columns from the non-limiting Figure 1) from different websites.

*Cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) ("[T]he claims are not simply directed to *any* form of storing tabular data….") (emphasis original); *see also IBM*, 642 F. Supp. 3d at 490 (distinguishing *Enfish*: "The novel data structure in *Enfish* was required by the claims. In contrast, the [asserted] claim language…are not directed to a specific data structure that improves the way a computer generates and distributes tailored promotions."). "No special rules or details…are recited." *Secured Mail*, 873 F.3d at 910. And nothing in the claim improves how "systems store and access data"; instead, the map merely exploits a computer's "ordinary capacity" to store information—obviating the need for programmers to collect and link data manually. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) (distinguishing *Enfish*).

Consistent with Claim 1's lack of specificity, the specification notes that ***any*** "database" can constitute the universal variable map. 10:3-5 ("***[O]ne example*** of the [the universal variable map] is implemented as variable database 530…."). To the extent ***other*** portions of the specification further describe the map or its generation,[6] Claim 1 lacks any corresponding elements. For example, while the specification describes certain "heuristics" for using the database (14:60-16:49; FAC ¶24), Claim 1 lacks any such rules. The disclosed examples indeed are "[n]on-limiting." 15:1-2. Any argument relying on such heuristics would not be "tethered to" the asserted claim. *SurgeTech*, 2023 WL 7182200, at *6 (quoting *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1364 (Fed. Cir. 2023)); *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) ("features that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo/Alice* analysis"). Instead, the "focus of the claims, therefore, remains at a high level on"

[6] The FAC touts several, such as extracting variables from a site's source code (FAC ¶¶14, 16, 19) or directing customers to relevant pages "without any pre-existing relationship" (*id.* ¶¶14, 25).

the automated generation of deep-linked ads. *Erie*, 850 F.3d at 1328. Reciting the "universal variable map" as the chosen index, "with little more, does not change that conclusion." *Id*.

**2. The Remaining Claim Elements Likewise Concern Collecting and Analyzing Data—Not Any Technological Improvement**

Aside from reciting the above-discussed map and the automated creation of deep-linked ads, Claim 1 merely recites at a high level the collection, analysis and manipulation of data—not any patentable improvement in computer technology. *See, e.g.*, *Zillow*, 50 F.4th at 1378; *Elec. Power Grp.*, 830 F.3d at 1353. In this regard, Claim 1 is analogous to the "computer-implemented method" this Court recently addressed in *Recentive*, 2023 WL 6122495, at *1.

The *Recentive* claims concerned "a computer-implemented method of dynamically generating a network map," including "receiving" a schedule of events, "generating" a network map based on the schedule, "automatically updating" the network map in real-time, and "using the network map" to make determinations concerning events. *Id.* This Court found the claims directed to a "familiar class of claims directed to a patent-ineligible concept"—those that collect, analyze, and display information. *Id.* at *9 (citing *Elec. Power Grp.*, 830 F.3d at 1353).

Here likewise, Claim 1's method includes "generating" deep-linked ads, which per the specification includes steps of data gathering—"extracting" in the claim's parlance—and archiving. 3:48-55. Claim 1 also recites "automatically directing" users in real-time, which again necessarily includes steps of inferring and linking. *Id.* Claim 1 then recites using (or "passing") the information gleaned when generating the deep-linked ad to determine what should be presented to the user, which the specification describes as "programmatic use of dynamic data and the programming containers or variables for this dynamic data." *Id.* Like those in *Recentive*, Claim 1 does not purport to "improve technical functioning," but merely "use a computer as a tool to" (*Recentive*, 2023 WL 6122495, at *9) "automat[e] the spidering or otherwise data gathering,

archiving, inferring, linking and programmatic use of dynamic data and the programming containers or variables for this dynamic data" to generate deep-linked ads. 3:48-55.

It is immaterial whether manually programming "thousands if not millions of programming variables" (FAC, ¶24) was "possible … in real-time" (*id.*, ¶25). Nothing in Claim 1 ties the automation to any "improvement in the *functioning* of the system." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1333, 1337–40 (Fed. Cir. 2017) (emphasis original) (finding claims involving "improved scalable architecture for delivering real-time information" invalid under § 101). At best, Claim 1 "uses of generic computer components to carry out the recited abstract idea." *Id.*

Nor does it matter that Claim 1 recites "pre-populat[ing]" the second site or application with values extracted from the first site (FAC, ¶¶26-28). Essentially identical language appeared in the '378 patent application claims, which the PTO ***rejected*** (*see supra* §II.B-C; McKiernan Ex. A). As the PTO repeatedly stressed and MetaRail never disputed, pre-populating values was a "conventional" concept and could not circumvent *Alice*. FAC Ex. J at 147, 491. MetaRail's FAC concedes that the pre-population in this context is facilitated by the "universal variable map" and the automation it facilitated. FAC, ¶25 (citing FAC Ex. J at 268). By MetaRail's own account, in other words, pre-population is "post-solution activity." *Zillow*, 50 F.4th at 1379. And nothing in Claim 1 recites any technological advance enabling this practice of pre-populating data. The "New Search Site Webpage" instead is generated using the same conventional computer architecture generating the "old site." FAC, ¶28.

Tellingly, while MetaRail cites Google documentation as "tout[ing]" MetaRail's supposed "technological advancement," none of the material suggests anything at all regarding pre-populating values. FAC, ¶31. The cited materials instead discuss deep-linked ads generically and

note how they "drive…users directly into relevant app pages." *Id*. But as the specification admits and the FAC confirms, such deep-linked ads predated MetaRail's purported invention. *See supra* §IV.A.1.a. The specification instead "frame[d] the inventor's problem in terms of how to improve existing [deep-linked ads by automating their creation], not how to improve computer technology." *Trinity*, 72 F.4th at 1363. MetaRail's citations in paragraph 31 thus confirm Claim 1's ineligibility.

### B. *Alice* Step Two: Claim 1 Fails to Recite Any Inventive Concept

*Alice* step two concerns whether the challenged claim recites an "inventive concept" that "amounts to *significantly* more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18. "[C]onventional, routine and well understood applications" do not constitute an inventive concept. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015). Nor can an abstract idea itself provide an inventive concept. *PersonalWeb*, 8 F.4th at 1318. "To save a patent at step two," something ***beyond*** the abstract idea must be "evident in the claims" themselves—not merely in the specification. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); *IBM*, 642 F. Supp. 3d at 495 ("It is improper for IBM to point to unclaimed features of the '904 patent to support its *Alice* step two analysis.")

#### 1. Increased Speed and Efficiency is Immaterial

Here, however, Claim 1 lacks anything material beyond the above-discussed abstract concepts of automatically generating deep-linked ads using a "universal variable map" and otherwise collecting and analyzing data. It is irrelevant whether the invention generates such ads more quickly than earlier approaches. *OIP*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

Claim 1 as issued instead closely tracks claim 25 of the application for the earlier '378 Patent ***before*** MetaRail extensively revised the claim to overcome the PTO's repeated § 101 rejections. *See supra* § II.C & McKiernan Ex. A. It also closely tracks the challenged claims in

*Recentive*, in which this Court emphasized that reciting "conventional computing devices" are insufficient to transform abstract ideas into patent-eligible subject matter. 2023 WL 6122495, at *12. Just as it was undisputed that "Recentive did not invent machine learning," *id.*, the '626 Patent admits MetaRail did not invent deep-linked ads, but instead merely sought to automate them to reap "new market efficiencies"—yielding "greater economic gains for a larger cross-section of publisher and advertiser sites," 3:36-42. But such increased "speed and efficiency" does not suffice under *Alice* step two. *Repifi Vendor Logistics, Inc. v. IntelliCentrics, Inc.*, No. 2021-1906, 2022 WL 794981, at *3 (Fed. Cir. Mar. 15, 2022); *see also IBM*, 642 F. Supp. 3d at 494 ("increas[ing] the efficiency in creating marketing promotions" insufficient under *Alice* step two).

### 2. Claim 1 is Fundamentally Different From Those At Issue in *DDR*

Nor can MetaRail evade § 101 by purported analogy to *DDR*, which concerned fundamentally different claims addressing "a problem specifically arising in the realm of computer networks" (the threat of website visitors being lured away by "clicking on an advertisement and activating a hyperlink") and solving it with a technological solution that ***altered*** "the routine, conventional functioning of Internet hyperlink protocol." 773 F.3d at 1257.

Here, unlike *DDR*, "where the patent claims specified how interactions with the internet are manipulated to yield a desired result….the [Asserted] patents merely recite conventional steps required to navigate an electronic database and recite conventional technology to implement these steps." *IPA Techs., Inc. v. Amazon.com, Inc.*, 352 F. Supp. 3d 335, 345 (D. Del. 2019). Automated deep-linked ads yield the same "routine and conventional result that one would obtain when manually" programming such ads. *D&M Holdings Inc. v. Sonos, Inc.*, C.A. No. 16-141, 2017 WL 1395603, at *10 (D. Del. Apr. 18, 2017). The inventors merely automated the creation process to increase efficiency. 3:16-47. And they stressed that any conventional components could be used to do so. *E.g.*, 21:18-21 ("***any medium***…"); 21:44-46 ("***any, hardware system, mechanism or***

***component*** that processes data, signals or other information"). These conventional components are "simply doing something ***on*** a web page" (namely, placing deep-linked ads) rather than "doing something ***to*** a web page" (e.g., altering standard hyperlink protocols). *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) ("*DDR Holdings* dealt with a patent that required doing something *to* a web page, not simply doing something *on* a web page, a difference that the court regarded as important to [§ 101].") (emphasis original).

The ostensible problem the '626 Patent solved was not how to make computers perform differently, but instead how to navigate between publishers and advertisers who used different terms (e.g., "automotive" versus "car") to describe the same concepts. But "maintaining data from multiple sources and organizing it" is a "problem that is ***not*** unique to technology." *SurgeTech*, 2023 WL 7182200 at *5 (distinguishing *DDR*). Navigating terminological differences instead is "an inherent part of any" relationship between publishers and advertisers. *Intellectual Ventures I LLC v. AT & T Mobility LLC*, 235 F. Supp. 3d 577, 591 (D. Del. 2016).

In sum, Claim 1 "neither provides a specific solution nor addresses a problem unique to the Internet." *MG Freesites Ltd. v. ScorpCast LLC*, 651 F. Supp. 3d 744, 754–55 (D. Del. 2023) ("[T]he need to tag information for ease of reference pre-dates the Internet."). It is immaterial that the '626 Patent discusses terminological differences in the "Internet-centric" ***context*** of deep-linked ads. *DDR*, 773 F.3d at 1258 ("[N]ot all claims purporting to address Internet-centric challenges are eligible for patent."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (affirming motion to dismiss complaint asserting claims to Internet-based advertising: "[U]se of the Internet does not transform an otherwise abstract idea into patent-eligible subject matter."). Put differently, as this Court did in *SurgeTech*, "just because the Internet permits" deep-

linked ads as a marketing strategy does not mean that navigating terminology differences on the Internet is a "technological problem." 2023 WL 7182200, at *5 (collecting cases).

*DDR* is therefore inapposite—just as the PTO stressed when rejecting analogous claims in the predecessor '378 Patent application because MetaRail's "methodology for targeted personalized advertising" worked "through the ***normal operation of the Internet***" rather than changing such operations as the *DDR* claims had specified. FAC Ex. J at 147; *see also supra* § II.B.[7] Nor can MetaRail contradict this intrinsic record with bald assertions that the alleged invention "transformed the Infrastructure of Internet advertising" (FAC, ¶14) or marked a "stark" difference as compared to earlier approaches (*id*., ¶27). The Court need not "accept as true" such hollow rhetoric. *Secured Mail*, 873 F.3d at 913; *Recentive*, 2023 WL 6122495, at *5.

### C. Amendment of The Challenged Count is Futile

Given that the language of Claim 1 is fixed, any further amendment of the Complaint would be futile and MetaRail accordingly should not be granted leave to amend. *Recentive*, 2023 WL 6122495, at *13 (denying leave to amend where "[t]he claims of the patents say what they say"). Further amendments would just confirm what MetaRail's FAC already makes plain as detailed above: "any allegation of unconventionality…would not be plausible considering the contrary teachings of the specification." *Tenaha Licensing LLC v. Tigerconnect, Inc*., C.A. No. 19-1400, 2020 WL 30426, at *9 (D. Del. Jan. 2, 2020).

## V. CONCLUSION

For the reasons stated above, Google LLC respectfully requests that the Court dismiss Count IV of the FAC for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

---

[7] The later reference to *DDR* during '626 Patent prosecution merits no deference, particularly given the inconsistency with the PTO's earlier analysis. *See Recentive*, 2023 WL 6122495, at *6 ("[C]ourts in this District have previously confronted the PTO's examples and declined to defer to their findings or conclusions.").

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Gregory F. Corbett
Charles T. Steenburg
Marie A. McKiernan
Jie Xiang
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Tel: (617) 646-8000

Elizabeth A. DiMarco
John W. McGrath
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 571-5001

Dated: January 26, 2024
11291498 / 12599.00061

By: */s/ David E. Moore*

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew M. Moshos (#6685)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Defendant Google LLC*