**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| METARAIL, INC., | ) | |
| Plaintiff, | ) | C.A. No. 23-1116-GBW |
| v. | ) | |
| GOOGLE LLC, | ) | |
| Defendant. | ) | |

**PLAINTIFF METARAIL, INC.'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

ASHBY & GEDDES
John G. Day (#2403
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Marc Belloli
M. Elizabeth Day
Jerry D. Tice II
Richard C. Lin
Hillary N. Bunsow
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
(650) 351-7248
mbelloli@bdiplaw.com
eday@bdiplaw.com
jtice@bdiplaw.com
rlin@bdiplaw.com
hillarybunsow@bdiplaw.com

Dated: February 9, 2024

## TABLE OF CONTENTS

Page


I. INTRODUCTION: THE ’626 PATENT IS A QUANTUM LEAP OVER PRIOR TECHNIQUES FOR DEEP-LINKED INTERNET ADVERTISEMENTS ...................... 1

II. THE ’626 PATENT CLAIMS SPECIFIC, TECHNOLOGICAL IMPROVEMENTS TO CONVENTIONAL DEEP-LINKED INTERNET ADVERTISEMENTS .................. 2

III. THE ’626 PATENT IS SUBJECT MATTER ELIGIBLE ............................................. 10

A. Step One: The ’626 patent is “directed to” specific, technological improvements to deep-linked Internet advertisements, not an abstract idea ........ 10

1. Google’s Flawed Step One Analysis ...................................................... 13

B. Step Two: The ordered combination of elements that form the ’626 patent’s technique for improving deep-linked Internet advertisements supplies an inventive concept ........................................................................................... 17

1. Google’s Flawed Step Two Analysis....................................................... 18

IV. FACTUAL DISPUTES REGARDING INVENTIVENESS REQUIRE DENIAL OF THE MOTION.......................................................................................................... 19

V. CONCLUSION.......................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Attentive Mobile Inc. v. 317 Labs, Inc.*,
C.A. No. 22-1163-CBJ, 2023 WL 6215825 (D. Del. Sept. 25, 2023) ....... passim

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ....... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 19

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ....... 15

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ....... 19

*ChargePoint, Inc. v. SemConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) ....... 10

*Cirba Inc. v. VMware*,
C.A. No. 19-742-GBW, 2023 WL 2989049 (D. Del. April 18, 2023) ....... 2

*Core Wireless Licensing S.A.R.L. v. LG Elecs. Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) ....... 11

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ....... passim

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ....... 14

*Eos Positioning Sys., Inc. v. ProStar Geocorp, Inc.*,
2023 WL 2709037 (D. Del. Mar. 30, 2023) ....... 20

*Int'l Bus. Machines Corp. v. Zynga Inc.*,
642 F. Supp. 3d 481 (D. Del. 2022) ....... 18

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ....... 13

*Nielsen Co. (US), LLC v. HyphaMetrics, Inc.*,
C.A. No. 21-1591, 2022 WL 3211915 (D. Del. Aug. 9, 2022) ....... 20

*Recentive Analytics, Inc. v. Fox Corp.*,
C.A. No. 22-1545-GBW, 2023 WL 6122495 (D. Del. Sept. 19, 2023) ................................ 16

*SurgeTech, LLC v. Uber Techs. Inc.*,
C.A. No. 22-882-GBW, 2023 WL 7182200 (D. Del. Nov. 1, 2023).................................... 16

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020)........................................................................................ 10

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) ................................................................................... 17, 20

**STATUTES**

35 U.S.C. § 101 ........................................................................................................... 20

## I. INTRODUCTION: THE '626 PATENT IS A QUANTUM LEAP OVER PRIOR TECHNIQUES FOR DEEP-LINKED INTERNET ADVERTISEMENTS

'Paragraphs 10-31 of the First Amended Complaint (FAC) detail how the inventions of the '626 patent defied convention and solved Internet-centric problems with specific improvements to deep-linked advertisements. Specifically, the novel technique generates and serves deep-linked ads based on a "universal variable map" that links "programming variables" for dynamic data across numerous websites such that when a user clicks on an ad generated by the technique, dynamic data is extracted from the search site and the user is ported to a merchant site where the various variables regarding a prospective purchase can be pre-populated.

This invention was a paradigm shift that stood in stark contrast to the prior art techniques for (1) generating ads based on keywords of the static content on a webpage; (2) deep-linked ads where a user was simply sent to a page other than a home page; and (3) pre-programmed, parameter-based searches of a standalone website.

Without the advances claimed in the '626 patent, if you queried "flights from SFO to LAX" you might get an ad for an airline and a link to take you to the site. With the inventions claimed in the '626 patent, because the search website and the merchant websites are linked via programming variables underlying the two sites, your search generates a targeted ad regarding flights going from San Francisco to Los Angeles, and a link that, if clicked, takes you directly into an airline's website with relevant information regarding the trip expressly or implicitly pre-populated. This technology is greatly beneficial to advertisers because it effectively fast-forwards the user deep into a sales conversion funnel, which increases return on advertising investment.

Google tries to deny these inventions by over-simplifying the claims to nothing more than "automating existing human processes" and in doing so ignores the teachings of the specification. The claims are not simply about automation, "translation" or "indexing." Rather, the claims in the

’626 patent are directed to *how* new and improved deep-linked ads are generated and used to better serve the customer, the search site operator and the advertising merchant. Google’s arguments also read much like Section 102 and 103 attacks rather than arguments about eligibility, which is not the proper inquiry.

There are three particularly relevant cases that confirm the ’626 patent is patent eligible. First, *Attentive Mobile*, a recent case in this District which finds eligible nearly identical subject matter to the ’626 patent. *Attentive Mobile Inc. v. 317 Labs, Inc.*, C.A. No. 22-1163-CBJ, 2023 WL 6215825 (D. Del. Sept. 25, 2023). The ’626 patent, conceived 6.5 years before the patents in *Attentive Mobile*, is an even greater advancement in deep-linking technology. Moreover, the Federal Circuit’s decisions in *DDR* (2014) and *Weisner* (2022) confirm that the specific techniques for solving Internet-centric problems like those of the ’626 patent are patent eligible.[1]

## II. THE ’626 PATENT CLAIMS SPECIFIC, TECHNOLOGICAL IMPROVEMENTS TO CONVENTIONAL DEEP-LINKED INTERNET ADVERTISEMENTS

Prior to Metarail’s invention in 2010, Internet “Search Advertising” systems relied on the keywords a user typed to select the ads to present. D.I. 15, ¶¶ 11-12, Ex. H[2], at 1:56-63, 2:11-45. These prior ads were selected and served using “the static content” of a webpage that is displayed to a user. *Id.* These searches were not entirely helpful. *Id.* For example, if seeking a flight from San Francisco to Los Angeles one might query “flights from SFO to LAX” but most of those words would not appear on the static Southwest Airlines webpage. *Id.*

---

[1] Google also contends that certain claim elements concern “collecting and analyzing data.” D.I. 17 at 15. This Court’s decision in *Cirba Inc. v. VMware*, C.A. No. 19-742-GBW, 2023 WL 2989049 at *2 (D. Del. April 18, 2023) confirms that claim 1 of the ’626 patent does more than “merely collect, analyze, and display available information” because it is “directed towards a non-abstract technological improvement.”

[2] Exhibits A to J are the exhibits to the FAC. Citations to these exhibits are identified by ECF page number. Exhibit 1 is attached to this opposition. Citations to Google’s exhibits are identified by the endorsed PDF pagination reflected at the bottom of each of the documents.

Deep-linked and parameter-based advertisements were a recent advancement but, in 2010, they were still primitive. D.I. 15, ¶ 13, Ex. H at 2:53-54, 3:16-36. "Deep-links" at the time were simply links that directed a user past the homepage and to content inside the website. *Id.* E-commerce sites allowed for parameter-based searches of their own site—e.g., where someone is traveling to and from. *Id.* These ads had to be pre-programmed and were not based on linking underlying programming variables between a search website and a merchant website. *Id*.

The '626 patent dramatically improved Internet search-based advertisements. D.I. 15, ¶¶ 10, 14-26; Ex. H at 1:31-46, 2:25-45, 3:6-17, 4:7-17, 5:26-48, 5:61-67, 9:30-10:19, 10:3-4, 10:20-26, 11:16-30, 13:34-14:25, 14:6-25, 14:54-64, 17:3-11, 18:25-61. The '626 patent claims a new technique for generating and serving advertisements from a publisher's website (e.g., a search website like Google) that links to advertisers' websites (e.g., merchant websites like airlines) not based on static words on the website or pre-built, non-dynamic deep-links but based on links between the "programming variables" of numerous websites through a "universal variable map." *Id*. Generating ads in this way allows the search website to extract "values" input by a user that correspond to the programming variables and pre-populate them on the merchant website when the customer is sent to the merchant website in accordance with the underlying programming of the merchant website. *Id*. The technical improvements underlying the inventions allowed advertisers to generate and serve more targeted and personalized advertisements as well as enable a user to land directly on a results page or checkout page, rather than a home page. *Id*. Moreover, use of programming variables allowed for passing dynamic values—including values typed by a user during the search and unknown prior to the search—to the landing page so they can be used to prepopulate relevant portions of the page in accordance with underlying programming variables. *Id*. The powerful underlying technology of the '626 patent allows for substantially increased conversion rates and monetization for Internet

merchants. *Id*.

Google's motion focuses on the outcome that results from implementing the claims (i.e., "automating the placement of deep-linked ads") and ignores the underlying, inventive technology that allows for the outcome to happen. The specification is chock full of details explaining ***why*** the claimed inventions are a technological advancement. *See*, *e.g.*, D.I. 15, ¶ 30; Ex. H at 1:35-46, 3:6-16, 4:7-17, 5:61-67. In short, the inventions allow for the valuable outcome of automatically generating highly relevant ads by going "under the hood" of multiple websites and mapping underlying programming variables across the websites. This "universal variable map" further enables the transfer and pre-population of dynamic data on the results or checkout page of a merchant website. *Id.* The invention thus "fast-forwards" the user deep into the sales conversion funnel which increases a merchant's conversion rates, performance, and return on investment. *Id.* Google itself touts the same virtues of the '626 patent when marketing the infringing technology to its advertising customers. D.I. 15, ¶ 31.

The following example from the FAC also demonstrates the novelty of the '626 patent, how it departed from convention and how it advanced the art. D.I. 15, ¶¶ 27-29. Under the conventional method – e.g., "Search Advertising" based on keywords – a search for "flights from SFO to LAX" at best might yield generic advertisements for airlines like Southwest and a link to direct you to the airline's site with no pre-populated information:

**<u>Old Advertisement</u>**:



**Old Search Site Webpage**:




D.I. 15, ¶ 27.

In contrast, using the inventions claimed in the '626 patent and generating a deep-linked ad based upon a universal variable map that links the programming variables of the search website and various other websites (e.g., airlines and travel sites) leads to the creation of an advertisement that is exactly what the customer is searching for. *Id.* Moreover, because the programming variables of the search site and the airline are linked via the universal variable map, "values" (e.g., "SFO" and "LAX") corresponding to the programming variables are extracted and pre-populated in the relevant portions of the airline site when the user clicks on the ad.

**New Advertisement**:



**<u>New Search Site Webpage</u>**:




D.I. 15, ¶¶ 28-29.

"***How***" this new and improved form of deep-linked advertisements works is described in the '626 patent's specification and is embodied in claim 1 of the '626 patent:

1. A method, comprising:

generating, by a server computer, a deep-linked ad utilizing a universal variable map stored in a data store and accessible by the server computer, the universal variable map linking programming variables across multiple sites on the Internet and applications;

serving, by the server computer, the deep-linked ad through a first site or mobile application, the deep-linked ad linking a first set of programming variables of the first site on the Internet or the first mobile applications with a second set of programming variables of a second site on the Internet or a second mobile application, the first set of programming variables being associated with the second set of programming variables in the universal variable map stored in the data store; and

in response to a user interacting with the deep-linked ad displayed on a user device through an instance of the first site on the Internet or the first mobile application:

extracting, through the first site on the Internet or the first mobile application, values corresponding to the first set of programming variables;

automatically directing the user device to the second site on the Internet or the second mobile application; and

passing the values corresponding to the first set of programming variables to the second set of programming variables such that one or more fields corresponding to the second set of programming variables of the second site on the Internet or the second mobile application are explicitly or implicitly pre-populated with the

> values extracted through the first site on the Internet or the first mobile application.

Ex. H.

Key to the invention is the inventors' realization that using programming variables—underlying code of a website rather than the static display presented to a user—and dynamic data based on what the user was inputting (via typing or hovering over content), web advertisements could, for the first time, allow for the dynamic generation of online advertisements to drive potential customers to more relevant pages (i.e., the dynamic page URL as opposed to the static home page URL), without any preexisting relationship and without relying on static page data. D.I. 15, ¶ 14; Ex. H at 9:30-63; 10:20-26.

This is seen in claim 1 where a "universal variable map" of "programming variables" across numerous arbitrary sites ***links*** the programming variables of a "first site" with the programming variables of a "second site" in order to generate and serve an ad. Ex. H. Programming variables are, for example, "placeholders for dynamic data that a user types in on a site, or clicks on or hovers over on a site" and the invention allows for that "dynamic data" to be passed as "values" between the website where the search occurs and the merchant's website. Ex. H at 9:30-63. Moreover, when the user clicks on the deep-linked advertisement, the values corresponding to the programming variables are extracted and passed to a merchant website, allowing for the extracted values to be explicitly or implicitly pre-populated on the merchant website via its programming variables.

As illustrated in Fig. 9, the programming variables can refer to the underlying "source code and data" of a webpage, rather than the static information displayed on the webpage. *Id.* at 13:34-46, 14:6-25. As confirmed by the file history of the parent patent, the foregoing was in stark contrast to prior methods that were "based on reviewing the ***content*** of websites" and not "leveraging explicit or implicit programming variables or containers of data on websites." Ex. J, at 308 (emphasis added).

While "prior art approaches … focus[ed] on mapping visible, static content on web pages," these inventions relied on programming variables which "are computer programming elements – they are not visible to consumers who visit websites." *Id.* at 266.

A non-limiting example of one embodiment of the universal map with three different programming variables for three different websites is set forth in the specification:

| Web Sites | xxx.com | yyy.net | zzz.org | . . . | Normalized Variables |
|---|---|---|---|---|---|
| Variable 1 | Orig | Depart_City | From | . . . | from |
| Variable 2 | Dest | Arrival_City | To | . . . | to |
| Variable 3 | . . . | . . . | . . . | . . . | . . . |
| . . . | . . . | . . . | . . . | . . . | . . . |

Ex. H at 9:64-10:19. As shown above, while three different websites have different ways in which they identify programming variables for dynamic input fields indicating from where a flight originates and lands (e.g., the underlying code for a user text input box corresponding to departure and arrival). The programming variables are mapped in a "universal variable map," allowing, for the first time, dynamic data to be passed and properly pre-populated among websites with no prior relationship. D.I. 15, ¶ 22.

Linking the programming variables of numerous webpages via a universal variable map allows not only for the identification of relevant webpages, but for the passage of parameters or "values" between the webpages. *Id.* at 13:5-50, 17:3-11. As the specification confirms: "By creating this universal schema, if web site A wants to advertise a deep-linked ad for web site B, the Ad system would already know what the respective variable names were called and could programmatically create an ad with accurate mappings without any human intervention." *Id.* at 13:65-14:2. This was a departure from the prior art which "lack[ed] a universal variable map and hence its contained data." Ex. J at 268. As the specification further confirms: "Leveraging this unique and comprehensive

universal variable map, embodiments can take a web site visitor from an initial stop (e.g., a home page of a first web site such as a search site) directly and in real-time through a specific deep-link ad to a landing page on another site (e.g., a checkout page of a second web site) or to a home page on another site with as much data pre-populated as available based on the user's input in the context of the particular E-commerce transaction." Ex. H at 5:30-38, 18:25-61. "There is hence an indefinite number of cascading deep-linked ads that can be set up, each having the ability to leverage all of the user input-explicitly typed in, or implicitly inferred from the user's clicks or hovers-up to that point." *Id.* at 5:44-48.

In practice there will be thousands if not millions of programming variables for different kinds of searches for different kinds of services and goods (also known as "verticals"). D.I. 15, ¶ 15, fn. 5 ¶ 22. "The names of all such variables are [ ] archived in a universal variable map." Ex. H at 10:3-4. Once a site is categorized into the appropriate vertical, sub-vertical, product category etc., the universal variable map may then be completed by mapping the variables saved and indexed to their normalized versions using adaptive heuristics, allowing for the automatic and optimized generation of deep-linked ads and the presentation of the deep-linked ads by accessing variable mapping information and URL landing information. *Id.* 11:16-30; 14:54-64.

This invention "enables a fundamental advance in the utility of the Internet, because consumers can search for something to buy once, and then have their specific search details passed from site to site without them needing to re-type it, even if the sites themselves have no relationship or are not associated in any way." Ex. J at 265. The underlying technology of the "invention thus is able to transform the entire Internet into one giant shopping mall." *Id.*

## III. THE ’626 PATENT IS SUBJECT MATTER ELIGIBLE

### A. Step One: The ’626 patent is “directed to” specific, technological improvements to deep-linked Internet advertisements, not an abstract idea

As discussed in **paragraphs 10-31 of the FAC** and in Section II above, the ’626 patent claims patent eligible subject matter because it is directed to an improved technique for generating and serving deep-linked Internet ads where specific details are passed from a publishing site (e.g., a search engine site) to an advertising site (e.g., a merchant site) using underlying programming variables of the sites. The improved technique involves a server that generates and serves a deep-linked ad based on a “universal variable map” of “programming variables” across numerous arbitrary sites that links the programming variables of the search engine site with the merchant site. *Id.* Because the two sites are linked via programming variables, the inventions further allow for the extraction and passing of “values” corresponding to the programming variables from the search engine site to the merchant site, which are expressly or implicitly pre-populated on the merchant site. *Id.* This is a “new and useful” improvement under § 101.

The Step One inquiry involves “understand[ing] the problem facing the inventor and, ultimately, what the patent describes as the invention.” *ChargePoint, Inc. v. SemConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019). Here, the patent’s specification and the FAC (D.I. 15, ¶¶ 10-31) identify the problems/drawbacks with existing deep-linked ad technology and describe how the ’626 patent was a quantum technological leap further advancing digital advertising and serving deep-linked ads. Accordingly, “the focus of the claimed advance is on improving” existing deep-linked ads, “with the improvement assertedly being an efficient way” to generate deep-linked ads based on a universal variable map that links the programming variables of a search site and a merchant site such that values can be passed and pre-populated on the merchant site. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1296 (Fed. Cir. 2020). Claim 1 therefore recites a “specific [] improvement” in the

art. *Id.* at 1293; *Core Wireless Licensing S.A.R.L. v. LG Elecs. Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018) ("[C]laims focused on various improvements of systems [are] directed to patent eligible subject matter.").

Numerous cases confirm that claim 1 of the '626 patent is eligible. ***First***, the recent decision from Judge Burke in the *Attentive Mobile* case is directly on point. *See Attentive Mobile*, 2023 WL 6215825, at *4. The claims in *Attentive Mobile* concerned promotional ads on a website that, when clicked on, deep-linked to a web application and passed information related to the user such that it was pre-populated in the application. *Id.* at *4. That subject matter—which closely mirrors the subject matter of the '626 patent—is eligible:

> The Court comes to this conclusion because the patent specification tells us time and time again in many different ways that how[ever one] might articulate what [c]laim 1 is directed to, that concept needs to take into account the fact that the claim makes use of what the patent refers to as a custom-generated deeplinking process. More specifically, what [is] key to the patent is that in response to a user clicking on a website's promotional advertising and using a first application, a URI generated by the claim's click-to-text server then deep[l]inks to a second messaging application[,] in which a custom enrollment message with data related to that user or the website that the user visited is automatically populated [in]to the messaging [app].

*Id.* at *4 (finding eligibility at Step One).

Clearly, both the '626 patent and the *Attentive Mobile* patents involve the same subject matter at a high-level—i.e., server generated deep-linked ads that, when clicked on, send the user to a second webpage that is pre-populated with information from the first webpage—and both are eligible. If anything, the claims of the '626 patent are far more "inventive" than the claims in *Attentive Mobile*. Indeed, the inventions of the '626 patent were conceived no later than December 2010 (Ex. H at 1:1-28), while the invention at issue in *Attentive Mobile* was conceived 6.5 years later in May 2017. *See* Ex. 1 (U.S. Patent No. 11,416,887). Moreover, the inventions of the '626 patent claim ***how*** to generate deep-linked ads based on a universal variable map that links programming variables across numerous

websites. *See, e.g.*, Ex. H at claim 1 ("the first set of programming variables being associated with the second set of programming variables in the universal variable map").

***Second***, the Federal Circuit's decision in *DDR* confirms that claim 1 of the '626 patent is eligible. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). In *DDR* the Federal Circuit found eligible claims that addressed an "Internet-centric problem" and "specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered" by the prior art. *Id.* at 1258-59. Specifically, the claims in *DDR* concerned mitigating the problem of a host website losing visitors who clicked on promotions and were redirected to a merchant website. *Id.* at 1257. The claimed solution was instead to respond to the click with a "composite web page" that combined visual elements of the "host" website with content of the merchant website, rather than simply redirecting the user to the merchant website. *Id*.

The rationale of *DDR* applies here. As in *DDR*, the '626 patent claims are specific to overcoming problems arising with conventional deep-linked Internet advertisements. This is an Internet-centric problem the '626 patent overcame by specifying "***how*** interactions with the Internet are manipulated to yield . . . a result that overrides the routine and conventional sequence of events ordinarily trigged." *Id.* at 1258 (emphasis added). Indeed, the '626 patent overrode convention (1) by generating and serving deep-linked ads based on a "universal variable map" of "programming variables" across numerous arbitrary sites that could link the programming variables of the search engine site with the merchant site and (2) further allowing for the extraction of the "values" corresponding to the programming variables from the search engine site and then pre-populating them on the merchant site. As discussed throughout Section II above, the '626 patent "recite[s] an invention that is not merely the routine or conventional use of the Internet." *DDR*, 773 F.3d at 1258-59.

Lest there be doubt that *DDR* is applicable here, the Patent Office found *DDR* the most applicable case when it found that the ’626 patent claims eligible subject matter and allowed the patent:

> [U]tilizing the claimed universal variable map to generate deep-linked ads and connections between publisher sites/apps and advertiser sites/apps via the programming variables and pass values corresponding to the programming variables from a first site/app to the linked programming variables on a second site/app such that fields on the second site/app result in being pre-populated is a technological solution to the problem addressed by Applicant and goes beyond generating of ad[s] in an online environment. Also, similar to the finding in the *[DDR]* decision regarding the manipulation of a website visitor’s navigation when they activate a link in an advertisement to achieve a desired result, Applicant’s invention also manipulates a website visitor’s navigation via deep-linked ads to achieve a desired result.

D.I. 18-2 at B-8. Notably, the Patent Office’s decision to allow the ’626 patent reads very much like Judge Burke’s decision in *Attentive Mobile*. *Attentive Mobile*, 2023 WL 6215825, at *4.

As demonstrated in Section II above, the ’626 patent was an extreme departure from convention. The ’626 patent ushered in a whole new paradigm for digital advertising on the Internet by generating deep-linked ads, which were linked in such a way through a universal map and programming variables to allow for the passing of values from the search site and pre-populating them on the merchant site. *Id*.

The ’626 patent claims eligible subject matter at Step One.

**1. Google’s Flawed Step One Analysis**

Google’s Step One analysis (D.I. 17 at 8-17) is a series of analytical errors. Google argues that the ’626 patent is nothing more than automating human activity through translation and indexing. *Id.* To argue this, Google turns a blind eye to the specification and waters down and grossly over-simplifies claim 1 of the ’626 patent. The Federal Circuit and this District have repeatedly cautioned against such arguments by accused infringers. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (“We have previously cautioned that courts must be careful to avoid

oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (internal quotes omitted). Indeed, the *Attentive Mobile* decision—dealing with strikingly similar subject matter—found that the defendant there (like Google here) was oversimplifying the claims. *Attentive Mobile*, 2023 WL 6215825, at *4 (citing *McRO*) and at *5 (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) and holding that "the step one inquiry 'cannot simply ask whether the claims *involve* a patent[-in]eligible concept[,] because essentially every routinely patent[-]eligible claim' does so at some level. For that reason, in *Enfish* the Federal Circuit cautioned District Courts not to 'describ[e] the claims at such a high level of extraction' [sic] so that the description is 'untethered from the language of the claims' in a way that 'all but ensures the exceptions to [Section] 101 [swallow] the rule.'").

Google commits other analytical errors to support its improper characterization of the patent at too high a level of abstraction. One such error is dissecting the claim into individual pieces and arguing that each individual piece is "conventional" or "well-known" and thus an abstract idea. D.I. 17 at 9-10, 12-17. Google does this in arguing that the universal variable map (by itself) and the pre-populating of websites (by itself) are abstract ideas or conventional activity. *Id.* at 12-17. Yet another such error is Google's argument that the specification "admits" that certain things—like prior art deep-links—were known in the art, which is somehow an indication of abstractness. *See*, *e.g.*, *id.* at 9-10. While Google's fly by night Section 102/103 analysis is improper here, Google nevertheless does not—and cannot—allege that the specific deep link ads here and their methods of generation were known at the time of the invention.

The *Attentive Mobile* court (citing the Federal Circuit's *BASCOM* decision) dispensed with these improper practices as well. *Attentive Mobile*, 2023 WL 6215825, at *8 ("Defendants seem to ignore this instruction from *BASCOM*. Instead, they continually note that each [] claim element . . .,

standing alone, [was] well known at the time. But *BASCOM's* point is that even claims that use many individual technological components that themselves were conventional can still be patent eligible if the particular *ordered combination* of those known elements are used in an unconventional way."); *see also BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (finding patent eligible the non-conventional and non-generic arrangement of known, conventional pieces).

Moreover, just because a small piece of an invention is known in the art "does not mean it was well-understood, routine and conventional." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018). Here, as discussed above and in Section II, claim 1 of the '626 patent is a clear departure from convention when viewed as whole. Indeed, the patent explains how server generated deep-linked ads based on a universal variable map of linked programming variables across numerous cites was an entirely new concept. Further, that these same ads linked the programming variables of a search site and merchant site such that dynamic data could be passed and pre-populated on the merchant's site was also an entirely new concept. The specification, the file history and the Examiner's finding in allowing the '626 patent all run directly counter to Google's arguments. D.I. 18-2 at B-8.

Google's "file history" arguments (D.I. 17 at 5-7, 16, 17-18) not only miss the mark, but further demonstrate the eligibility of the '626 patent. Google misleadingly implies that the "enhancing rules" limitations of the '378 patent overcame the 101 rejction. *Id.* at 6. However, there is no basis for this speculation, as that element is never mentioned as overcoming the rejection. During an interview, the Examiner agreed that "a proposed amendment" overcame the rejection; and the only amendment the Examiner mentioned was one that indicated that "the correspondingly linked one or more of the set of computer-readable field identifiers used by the second site or application are

determined using the universal variable map." Ex. J, 51, 126. This indication is also provided by the claims of the '626 patent, which similarly recites that "the deep-linked ad" "generat[ed]…utilizing a universal variable map" "link[s] a first set of programming variables of the first site on the Internet or the first mobile applications with a second set of programming variables of a second site on the Internet or a second mobile application." '626 patent, claim 1.

Nevertheless, discussion of single limitations of different claims in a vacuum is not relevant because, as discussed above, isolating claim limitations is not a proper § 101 analysis. Indeed, Google's focus on the prosecution of a different parent patent, rather than the claims of the '626 patent, the *Alice* framework, and the applicable caselaw is telling. What the prosecution history does demonstrate is that for the claims at issue here, the Examiner determined that they are patent eligible by relying on *DDR* in a notice of allowance that reads very much like the reasoning in *Attentive Mobile*. D.I. 18-2 at B-8; *Attentive Mobile*, 2023 WL 6215825, at *4. Under a proper analysis, it is clear that the '626 patent claims patent eligible subject matter.

The principal cases relied upon by Google are inapposite because the patents at issue in those cases are not anything like the '626 patent. The patents in *SurgeTech*, unlike the '626 patent, did not "cite to a technological problem." *SurgeTech, LLC v. Uber Techs. Inc.*, C.A. No. 22-882-GBW, 2023 WL 7182200, at *5 (D. Del. Nov. 1, 2023). Moreover, in *SurgeTech*, the parties agreed the claims were directed to merely allocating inventory, receiving sales data on the inventory, processing the sales data by a performance rating, and using that data to re-allocate inventory. *Id.* at *4. The *SurgeTech* patents were quintessential "do a human task on a computer" patents. Here, as discussed above, the '626 patent solves problems with and advances the computer art of deep-linked Internet ads.

In *Recentive*, while the patents purported to concern making network maps and machine

learning, the claims were directed to collecting data regarding "events," analyzing that data, updating information about the data, and then using the data to make some kind of decision. *Recentive Analytics, Inc. v. Fox Corp.*, C.A. No. 22-1545-GBW, 2023 WL 6122495, at *8-9 (D. Del. Sept. 19, 2023). Unlike the '626 patent, the *Recentive* claims do not cover *how* the art is advanced or how to improve the functioning of the computer arts.

In *IBM*, the claims merely concerned filling in fields about a new promotion, filtering a database of promotions, and finally assigning selected promotions to a list that is then saved. *Int'l Bus. Machines Corp. v. Zynga Inc.*, 642 F. Supp. 3d 481, 492 (D. Del. 2022). Unlike the '626 patent, the *IBM* claims did not present a specific improvement for creating deep-linked ads or solve an Internet-centric problem in a manner that overrides convention.

### B. Step Two: The ordered combination of elements that form the '626 patent's technique for improving deep-linked Internet advertisements supplies an inventive concept

The inventive concept of the '626 patent is the same as what the claim is directed to—an improved technique for generating and serving deep-linked ads based on a "universal variable map" of "programming variables" across numerous arbitrary sites that link the programming variables of the search engine site with the merchant site, and further allowing for the extraction of the "values" corresponding to the programming variables from the search engine site and then pre-populating them on the merchant site. *See* Section II *supra*.

As discussed in **paragraphs 10-31 of the FAC** and in Section II above, these claimed ideas were not well-understood, routine, or conventional at the time of invention. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). On this point, the Federal Circuit's opinion in *Weisner* is highly instructive. *Weisner v. Google LLC*, 51 F.4th 1073, 1085-88 (Fed. Cir. 2022). In *Weisner*, the Federal Circuit examined the statements in the specification and the well-pled allegations of a second amended complaint to find that "the record supports that the claims plausibly provide a

solution to an Internet-centric problem regarding web searches, allowing for more personalized search results than conventional methods." *Id.* at 1087-88. The Federal Circuit further found that the claims were "like the claims in *DDR* . . . because they provide a 'specific way' to solve the problem" addressed by the patent. *Id.* at 1088. Like the patent-eligible claims in *Weisner*, the '626 patent provides a specific, novel way for generating and serving deep-linked ads such that values corresponding to programming variables can be passed from a search engine site and pre-populated on a merchant site. *See* Section II *supra*. As such, they contain an inventive concept.

Another inquiry often addressed at Step Two is preemption, a "concern that undergirds our § 101 jurisprudence." *Alice*, 573 U.S. at 223. Assuming the '626 patent is directed to an abstract idea (it is not), the question becomes whether the inventive concept ties up or preempts too much of the claimed abstract idea. *Attentive Mobile*, 2023 WL 6215825, at *9 (finding no preemption issues with respect to closely related subject matter to the '626 patent). The scope of the claims of the '626 patent does not raise preemption concerns. Indeed, they claim a specific technique for deep-linked Internet advertisements (and not all techniques). Ex. H at claim 1. The claimed technique is limited to the scenario where a universal variable map of programming variables is used to link publishers' websites and advertisers' websites and to generate and serve a deep-linked ad. *Id.* The technique is further limited by using a link between the programming variables of the two sites to pass values corresponding to the programming variables between the two sites and create an expressly or inherently pre-populated page on the advertiser's site. *Id.* There can be no preemption concern.

**1. Google's Flawed Step Two Analysis**

Google barely addresses step two, but in doing so makes flawed arguments. It first argues that increased speed and efficiency are immaterial. D.I. 17 at 17. While a by-product of the '626 patent may be both speed and efficiency, it is not what the claims are directed to or what the inventive concept is as analyzed above.

Google then reiterates its "file history" arguments (D.I. 17 at 17-18), which have no merit as discussed in Section III.A.1 above. But even if the Court thought this argument *might* have merit, Google's allegations cannot be accepted as true on a motion to dismiss. *See* Section IV. below.

Google spends the remainder of its brief arguing that *DDR* is "fundamentally different" than the '626 patent. D.I. 17 at 18-20. As discussed above that is not the case, and this is confirmed by the *Weisner* decision. 51 F.4th at 1087-1088 (Fed. Cir. 2022) (re-confirming that the holding of *DDR* that patents that solve Internet-centric problems in a specific way are patent-eligible). Google failed to address *Weisner,* nor does Google meaningfully engage with the substance of claim 1 of the '626 patent or the specification. There is no question that the claims of the '626 patent are directed to a new and novel approach to generating and serving deep-link ads. Rather than tangle with this fact, Google seeks to improperly ignore it.

## IV. FACTUAL DISPUTES REGARDING INVENTIVENESS REQUIRE DENIAL OF THE MOTION

Metarail establishes with reference to claim 1 of the '626 patent, the specification, the file histories and other well-pled facts in paragraphs 10-31 of the FAC (D.I. 15) that the inventions of the '626 patent, among other things, (1) were not well-understood, routine, or conventional at the time of invention; (2) are not preemptive of prior techniques or other techniques of generating deep-linked ads; and (3) claim numerous benefits that demonstrate ***why*** this invention is a technological advancement. These are all issues of fact with which Google, providing scant reasons or analysis, disagrees.

But such disputes are not ripe for adjudication on a motion to dismiss. Metatrail's factual allegations regarding the inventiveness of the '626 patent are plausible on their face under *Twombly*. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Moreover, "plausible and specific factual allegations that the aspects of the claim are inventive" will defeat a motion to dismiss on § 101

grounds. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019).

Indeed, at this stage, the statements in the FAC, the specification and the file histories must all be read in a light most favorable to Metarail and accepted as true. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126-28 (Fed. Cir. 2018). In light of the record to date and the disputes regarding inventiveness outlined above, the controlling law mandates denying Google's motion. *Berkheimer*, 881 F.3d at 1369 ("The improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities."); *BASCOM*, 827 F.3d at 1350 ("On this limited record, this specific method of filtering internet content cannot be said, as a matter of law, to have been conventional or generic."); *Weisner*, 51 F.4th at 1084-88; *Eos Positioning Sys., Inc. v. ProStar Geocorp, Inc.*, No. CV 22-201 (MN), 2023 WL 2709037, *6-7 (D. Del. Mar. 30, 2023) (refusing to find on a motion to dismiss that claims directed to a system for collecting utility location information were invalid under § 101 because the patentee sufficiently pled that the claims had an inventive concept by "includ[ing] a number of allegations that plausibly suggest the real time and precision integration functionality into the moving or scrolling maps was accomplished in an unconventional way."); *Nielsen Co. (US), LLC v. HyphaMetrics, Inc.*, C.A. No. 21-1591-CJB, 2022 WL 3211915, *4-7 (D. Del. Aug. 9, 2022) (refusing to find on a motion to dismiss that claims were invalid under § 101 because patentee's allegations "create a material factual dispute as to patent eligibility").

## V. CONCLUSION

The Court should deny the motion because the '626 patent is subject-matter eligible.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*
John G. Day (#2403
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff*

*Of Counsel:*

Marc Belloli
M. Elizabeth Day
Jerry D. Tice II
Richard C. Lin
Hillary N. Bunsow
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
(650) 351-7248
mbelloli@bdiplaw.com
eday@bdiplaw.com
jtice@bdiplaw.com
rlin@bdiplaw.com
hillarybunsow@bdiplaw.com

Dated: February 9, 2024