**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| METARAIL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 23-1116-GBW |
| v. | ) | |
| | ) | |
| GOOGLE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS**
**<u>MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**


OF COUNSEL:

Gregory F. Corbett
Charles T. Steenburg
Marie A. McKiernan
Jie Xiang
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Tel: (617) 646-8000

Elizabeth A. DiMarco
John W. McGrath
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 571-5001

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew M. Moshos (#6685)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Defendant Google LLC*


Dated: February 23, 2024

# TABLE OF CONTENTS

I. BACKGROUND: THE SPECIFICATION ADMITS THAT HUMAN PROGRAMMERS HAD PREVIOUSLY CREATED DEEP-LINKED ADS ACROSS MULTIPLE SITES BY MANUALLY LINKING VARIABLES ........................ 2

II. *ALICE* STEP ONE: CLAIM 1 DOES NOT REFLECT A TECHNOLOGICAL IMPROVEMENT IN HOW DEEP-LINKED ADS WERE CREATED ............................. 3

A. The Specification Refutes MetaRail's Underlying Premise and Confirms that the '626 Patent is Directed to Automating the Creation of Deep-Linked Ads Such as Human Programmers Had Previously Created Manually ............................... 4

B. The Claimed Variable Map Embodies the Abstract Idea of Indexing and Translation and Does Not Reflect a Technological Improvement ............................... 5

1. MetaRail Concedes that the Map is an Abstract "Schema" For Automatically Rather Than Manually Linking Variables ...................................5

2. MetaRail Concedes That the Map is Claimed in Purely Functional Terms and Does Not Recite Any Specific Technical Improvement—Just Like the Claims in *IBM*, *Recentive*, and *SurgeTech* ............................................6

C. *DDR* and *Attentive* Are Fundamentally Different and Involve Technological Improvements Rather Than Automating Pre-Existing Processes................................. 7

III. *ALICE* STEP TWO: CLAIM 1 LACKS AN INVENTIVE CONCEPT AND INSTEAD MERELY AUTOMATES A CONVENTIONAL ONE................................... 10

IV. METARAIL'S ADMISSIONS CONFIRM THERE IS NO FACTUAL DISPUTE........... 10

**TABLE OF AUTHORITIES**

**CASES**

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) .......... 8

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .......... passim

*Attentive Mobile Inc. v. 317 Labs, Inc.*,
C.A. No. 22-1163-CBJ, 2023 WL 6215825 (D. Del. Sept. 25, 2023) .......... 2, 7, 8, 9

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
174 F.3d 1036 (9th Cir. 1999) .......... 6

*ChargePoint, Inc. v. SemConnect, Inc.*,
920 F.3d 759 (Fed. Cir. 2019) .......... 4

*Core Wireless Licensing S.A.R.L. v. LG Elecs. Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) .......... 9

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017) .......... 4

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 2, 7, 8, 9

*Eolas Techs. Inc. v. Amazon.com, Inc.*,
2024 WL 371959 (Fed. Cir. Feb. 1, 2024) .......... 5

*Int'l Bus. Machines Corp. v. Zynga Inc.*,
642 F. Supp. 3d 481 (D. Del. 2022) .......... 6, 8

*OIP Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .......... 4

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) .......... 4

*Promatek Indus. v. Equitrac Corp.*,
300 F.3d 808 (7th Cir. 2002) .......... 6

*Recentive Analytics, Inc. v. Fox Corp.*,
C.A. No. 22-1545-GBW, 2023 WL 6122495 (D. Del. Sept. 19, 2023) .......... 6, 7, 8

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) .......... 3, 10

*SurgeTech, LLC v. Uber Techs. Inc.*,
C.A. No. 22-882-GBW, 2023 WL 7182200 (D. Del. Nov. 1, 2023)............................. 4, 6, 7, 8

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ........................................................................................ 9

*VideoShare, LLC v. Google, Inc.*,
C.A. No. 13-990, 2016 WL 4137524 (D. Del. Aug. 2, 2016), *aff'd*,
695 F. App'x 577 (Fed. Cir. 2017) ................................................................................... 9

*Weisner v. Google LLC,*
51 F.4th 1073 (Fed. Cir. 2022) ................................................................................... 2, 10

**STATUTES**

35 U.S.C. § 101.................................................................................................................... 1

**TABLE OF EXHIBITS TO THE FIRST AMENDED COMPLAINT (D.I. 15)**
**CITED HEREIN**

| Exhibit Number | Description |
|---|---|
| FAC Ex. H | U.S. Patent No. 10,789,626 ("'626 Patent") [subject of Google's motion to dismiss] |

**TABLE OF EXHIBITS TO THE MCKIERNAN DECLARATION IN SUPPORT OF**
**GOOGLE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT (D.I. 18)**

| Exhibit Number | Description |
|---|---|
| D.I. 18-1 | Comparison of Claim 1 of the '626 Patent as Issued (including Redlines Illustrating Amendments to Overcome § 101 Rejection) with Claim 1 of the U.S. Patent No. 9,633,378 ("the '378 Patent") as Originally Filed |

**TABLE OF EXHIBITS TO METARAIL'S OPPOSITION (D.I. 19)**
**CITED HEREIN**

| Exhibit Number | Description |
|---|---|
| 1 | U.S. Patent No. 11,416,887 |

MetaRail's Opposition ("Opp.," D.I. 19) to Google's Motion to Dismiss the First Amended Complaint fails to refute that Claim 1 of the '626 Patent is directed to patent ineligible subject matter and merely automates the creation of deep-linked ads using the abstract idea of indexing and translation. As Google's opening brief ("Br.," D.I. 17) highlighted, the '626 Patent itself admits that such "connections" between "publisher" and "advertiser" websites had previously existed and were "***manually created by developing programmatic integrations between variables and fields on the publisher web site and the advertiser web site***." 3:16-3:20.[1]

MetaRail never even addresses this admission in the specification, which it filed years before *Alice* transformed § 101 law and the Federal Circuit in turn began consistently invalidating claims to automating existing human processes (Br. at 9-12). The only time MetaRail even cites this passage, MetaRail contradicts it by suggesting that earlier deep-linked ads were limited to links within a ***single*** site. Opp. at 3. But as Google explained (Br. at 7) and MetaRail fails to address, bald allegations cannot save a complaint when the intrinsic record dictates otherwise.

Nor does MetaRail dispute that the "universal variable map" underlying Claim 1 is merely an index for translating between variables across different sites. As Google explained and MetaRail concedes, the map is claimed in purely functional terms—without any indication how it improves computer technology rather than just exploiting existing capabilities to store data. Br. at 12-15. Instead, MetaRail touts how the "programming variables" are "under the hood" of websites. Opp. at 4. But as the '626 Patent's above-noted admission confirms, programmers had previously gone under the hood to link different websites' "variables and fields" together and thereby create deep-linked ads across the sites. 3:16-3:20. Automating that process using an index (universal variable map) without any further restriction is not patent-eligible under *Alice*.

---

[1] Unless indicated, citations are to the '626 Patent (FAC Ex. H) and emphasis is added.

Unlike *Attentive Mobile* (which concerned a specific type of deep-linked ad using an "integration tag" that improved how "computer technology worked") and *DDR*, Claim 1 merely describes automating existing processes ***on*** a webpage—not doing anything unconventional ***to*** a webpage. It profiles instead like the *Weisner* patents which did not claim any "specific implementation" but instead just preempted conventional processes. MetaRail's own admissions (which MetaRail ignores) confirm that conventionality and the lack of factual disputes.

## I. BACKGROUND: THE SPECIFICATION ADMITS THAT HUMAN PROGRAMMERS HAD PREVIOUSLY CREATED DEEP-LINKED ADS ACROSS MULTIPLE SITES BY MANUALLY LINKING VARIABLES

MetaRail's opposition turns on the false premise that MetaRail's purported invention enabled for the first time deep-linked advertisements between multiple websites by linking their different "programming variables." Opp. at 3. By MetaRail's litigation-driven account, the '626 Patent marked a "technological" advance over "conventional deep-linked Internet advertisements" (as discussed in MetaRail's eight-page background section, Opp. at 2-9) because such conventional deep-linked advertisements had been "primitive" and limited to links ***within a single vendor's "own site***." Opp. at 3 (citing D.I. 15, ¶ 13, Ex. H ['626 Patent] at 2:53-54, 3:16-36).

But the '626 Patent contradicts this assertion, as confirmed by the same passages MetaRail cites.[2] Column 2, lines 53-54 begins a paragraph that describes preexisting "deep-linked" ads in which an "advertiser" (e.g., a "travel" site) works with a separate "search" site. 2:53-67. Column 3 in turn explains that such deep-linked ads between different websites had previously been created manually, with programmers linking variables and field identifiers between publisher sites and advertiser sites after obtaining them from the respective site operators:

[2] Even paragraph 13 of the FAC (D.I. 15, ¶ 13) admits that earlier deep-linked ad connections had been between different websites, with manually created "integrations between variables."

> [s]o far in the industry, these deep-linked ad connections have been manually created by developing programmatic integrations between variables and fields on the publisher web site and the advertiser web site, created by manual code…. [E]ach web site uses its own field descriptors and variable names, and the only way to create deep-linked ads has been to manually obtain the names of the respective variables from both publishers and advertisers and then integrate them to each other through manual programming."

3:16-25. The remainder of MetaRail's cited passage notes that such manual programming was a "time and resource intensive activity"—putting practical limits on the extent of "market adoption." 3:26-36. MetaRail's purported invention instead merely provided "an automated way to generate deep-linked ads…and thereby produce greater economic gains for a ***larger cross-section*** of publisher and advertiser sites." 3:36-42.

MetaRail's allegations and arguments to the contrary "need not be accept[ed] as true," as they "contradict matters properly subject to judicial notice…such as the… patent specification," *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017).

## II. *ALICE* STEP ONE: CLAIM 1 DOES NOT REFLECT A TECHNOLOGICAL IMPROVEMENT IN HOW DEEP-LINKED ADS WERE CREATED

In connection with *Alice* Step One, Google's opening brief explained that:

(1) the '626 patent admits that deep-linked ads as claimed had previously been created manually (Br. at 8-10);

(2) automating such manual processes was an abstract idea (Br. at 10-12);

(3) the claimed "universal variable map" underlying the automation reflected the abstract idea of translation—not a technological improvement (Br. at 12-15); and

(4) the remaining claim elements likewise do not reflect any technological improvement (Br. at 15-17).

While disputing (1), MetaRail's arguments contradict the intrinsic record. *See supra* § I & *infra* II.A Moreover, MetaRail does not separately dispute (2), (3), or (4). MetaRail instead merely accuses Google of characterizing Claim 1 at "too high a level." Opp. at 14. But MetaRail itself characterizes Claim 1 at the same level—while contradicting the specification. Opp. at 10, 15.

### A. The Specification Refutes MetaRail's Underlying Premise and Confirms that the '626 Patent is Directed to Automating the Creation of Deep-Linked Ads Such as Human Programmers Had Previously Created Manually

Silently conceding that automation is not patentable, MetaRail instead tries to deflect the issue by accusing Google of "turn[ing] a blind eye to the specification." Opp. at 13. But it is MetaRail turning a blind eye. ***MetaRail never even acknowledges its "automated way" admission*** (*supra* § I)—even though Google repeatedly highlighted it (Br. at 3, 9).

The '626 specification indeed contradicts the premise underlying MetaRail's argument under *Alice* Step One—namely, that Claim 1 improved upon earlier deep-linked ads because "specific details are passed from a publishing site (e.g., a search engine site) to an advertising site (e.g., a merchant site) using underlying programming variables of the sites." Opp. at 10. By MetaRail' own pre-*Alice* admission (i.e., in the 2011 specification), humans had already been using "manual programming" to "integrate" different programming variables (e.g., "field descriptors and ***variable names***") across multiple sites. 3:16-25. And by MetaRail's own account, given that such variables were already "linked" across sites in these earlier manually programmed ads, they likewise allowed "dynamic data" to "be passed and pre-populated." Opp. at 15.

In the specification's own words, MetaRail's inventors merely sought an "automated way" to scale this process. 3:26-42. The purported "acute need" for automation was the alleged "problem facing the inventor[s]." *ChargePoint, Inc. v. SemConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (affirming ineligibility determination following Rule 12(b)(6) motion). But as Google explained and MetaRail does not refute, automating an existing manual process is quintessentially an abstract idea. Br. at 10-12 (citing *PersonalWeb*, *Credit Acceptance*, *OIP*, and *SurgeTech*).

Nor does the specification otherwise suggest that an automatically created deep-linked ad would be "improved from a technical perspective, or that it would operate differently than" one created manually. *ChargePoint*, 920 F.3d at 768. The inventors instead sought to spur "***wider***

***adoption*** of these kinds of ads" than was practical with manual programming. 3:36-42.[3]

### B. The Claimed Variable Map Embodies the Abstract Idea of Indexing and Translation and Does Not Reflect a Technological Improvement

The inventors sought to improve such scalability with the claimed "universal variable map" for translating between different variables and automating what programmers had previously done manually. While MetaRail repeatedly touts this map, it does not save Claim 1 from *Alice*—regardless of how new and useful increased scalability may have been in practice. Despite MetaRail's suggestion, the question is ***not*** whether "server generated deep-linked ads based on a universal variable map of linked programming variables across" two sites constituted a "***new*** concept." Opp. at 15. *Eolas Techs. Inc. v. Amazon.com, Inc.*, 2024 WL 371959, at *5 (Fed. Cir. Feb. 1, 2024) ("[A]n abstract idea that is new or groundbreaking is not any less abstract.").

#### 1. MetaRail Concedes that the Map is an Abstract "Schema" For Automatically Rather Than Manually Linking Variables

By MetaRail's own account, the variable map is just a "schema" allowing the "Ad System" to translate between the variables and thus "programmatically create an ad with accurate mappings without any human intervention." Opp. at 8 (citing 13:65-14:2). Accordingly, the map automates what programmers had previously done themselves: create "programmatic integrations between variables on the publisher website and the advertiser website." 3:16-20. Instead of "manually obtain[ing] the names of the respective variables from both publishers and advertisers and then integrate them to each other through manual programming" (3:22-25), MetaRail's invention

[3] Aside from greater scalability, the only benefit the specification suggests for automatically generated ads is that the "manual model requires prior knowledge of ads to be placed on a given publisher's site." 3:29-30. As with scalability, such convenience is an economic benefit—not a technical one. Moreover, Claim 1 of the '626 Patent has no such limitation. By contrast, the ancestor '378 patent claims mandate that the method work "***without*** necessitating any pre-existing relationship between the pages." D.I. 18-1 at A-2.

crawls the Internet obtaining programming variables from different sites,[4] then indexes them.

### 2. MetaRail Concedes That the Map is Claimed in Purely Functional Terms and Does Not Recite Any Specific Technical Improvement—Just Like the Claims in *IBM*, *Recentive*, and *SurgeTech*

Similarly, as Google explained (Br. at 13-14) and MetaRail never contests, nothing in Claim 1 specifies any particular form the variable map must take—much less how it improves the way deep-linked ads are created. Instead, the map need only link the "programming variables" of a first and second site on the Internet or mobile application. 22:21-53. It is just a fancy name for a "database" (9:30-36; 10:3-8; 11:15-24; 13:42-44) enabling the automation MetaRail's inventors sought to increase scalability rather than relying on human programmers to integrate variables when creating deep-linked ads across multiple websites (as column 3 of the '626 Patent admits they already had been doing before MetaRail's purported invention).

Accordingly, just like *IBM*, Claim 1 "not directed to a specific data structure that improves the way a computer generates and distributes" deep-linked ads. 642 F. Supp. 3d 481, 490 (D. Del. 2022). Google's opening brief highlighted this parallel (Br. at 13-14). Tellingly, however, MetaRail ignores it and instead dismisses *IBM* with hollow rhetoric about the '626 patent in the abstract—without any suggestion of a specific ***technological*** improvement. Opp. at 17. This misses the point: nothing in the '626 Patent requires any particular data structure for the universal variable map so long as it executes the abstract idea of indexing and translating the variables.

[4] MetaRail suggests that programming variables reflect "underlying code" rather than content "presented to a user." *Id*. at 7. But if even if this were a claim requirement, search engines had indexed code long before MetaRail's invention. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp*., 174 F.3d 1036, 1045 (9th Cir. 1999) (barring defendant from using plaintiff's trademark in "buried code or metatags" on defendant's website: "Search engines look for keywords in places such as domain names, actual text on the web page, and ***metatags***."); *see also Promatek Indus. v. Equitrac Corp*., 300 F.3d 808, 811 & n.1 (7th Cir. 2002) ("***Metatags are HTML [HyperText Markup Language] code***….The more often a term appears in the metatags…the more likely it is that the web page will be 'hit' in a search for that keyword….")

Similarly, just like *Recentive*, Claim 1 does not purport to "improve technical functioning," but merely "use a computer as a tool to" gather data (i.e., the programming variables) and store it in a database (i.e., the universal variable map). Br. at 15-16 (quoting 2023 WL 6122495, at *9 (D. Del. Sept. 19, 2023)). As MetaRail itself notes, "the *Recentive* claims did not cover *how* the art is advanced or how to improve the functioning of the computer arts." Br. at 16-17 (emphasis original). But as detailed above, neither does Claim 1—it uses "admittedly conventional [] techniques" (*see supra* § I) "described in broad functional terms." *Recentive*, 2023 WL 6122495, at *11. As Google's opening brief explained and MetaRail does not dispute, the claimed map can take ***any form*** provided it executes the abstract idea of translating between variables.

Finally, just like *SurgeTech*, the '626 Patent does "not cite to a technological problem, but one of human inefficiency that could be solved by automation." Br. at 11-12 (quoting 2023 WL 7182200, at *5 (D. Del. Nov. 1, 2023)). MetaRail's inventors indeed noted the scalability problems with the manual programming that human programmers had used to integrate variables across multiple websites. 3:16-29. MetaRail has no answer for this parallel—just like it consistently ignores the admissions in column 3 of the '626 Patent more generally. *See supra* §§ I-II.A. Instead, while ostensibly distinguishing *SurgeTech* as involving "do a human task on a computer" claims (Opp. at 16), MetaRail neglects the admissions in column 3 confirming that the universal variable map merely automates on a computer tasks human programmers had previously performed manually—namely, collecting and correlating variables across different sites.

### C. *DDR* and *Attentive* Are Fundamentally Different and Involve Technological Improvements Rather Than Automating Pre-Existing Processes

Aside from highlighting the parallels with Google's cases, MetaRail's admissions in the intrinsic record (*supra* § I-II.A) and its Opposition (*supra* II.B) confirm that *DDR*, *Attentive*, and MetaRail's other cited cases (Opp. at 10-13) are immaterial.

The Federal Circuit's *Affinity Labs* decision—distinguishing *DDR*—articulates the underlying distinction here. Cases such as *DDR* and *Attentive* involve "doing something *to* a webpage" (e.g., altering standard protocols), whereas cases such as *IBM*, *Recentive*, and *SurgeTech* involve "simply doing something *on* a web page" or other conventional platform—without reciting any technical improvement in how the components operate. *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) (emphasis original). Google highlighted this distinction (Br. at 18-19). Tellingly, MetaRail ignores it and never addresses *Affinity Labs*.

While touting *DDR*, MetaRail never addresses the bottom line—as Google's opening brief explained—that the *DDR* claims provided a "technological solution that ***altered*** 'the routine, conventional functioning of Internet hyperlink protocol.'" Br. at 18 (quoting *DDR*, 773 F.3d at 1257).[5] By contrast, as Google likewise explained and MetaRail never disputes, Claim 1's deep-linked ads "operate the same way—***using existing Internet protocols***—as earlier deep-linked ads that the '626 Patent admits were already in commerce." Br. at 1 (emphasis added). For example, as Google noted and MetaRail fails to address, the purportedly "New Advertisement" (Opp. at 5) uses the same conventional architecture as the "old" version. Br. at 16 (citing FAC, ¶28).[6]

Much like *DDR*, but unlike Claim 1 of the '626 Patent, *Attentive* turned on a claimed "integration tag" that was embedded in webpages and which Judge Burke found to be an "***improvement*** in [how] computer technology worked"—enabling a "***particular way***" to perform deep-linking different from earlier methods. 2023 WL 6215825, at *6-7 (D. Del. Sept. 25, 2023). Like *DDR*, the *Attentive* claims involved "doing something ***to*** a webpage" (*Affinity Labs*, 838 F.3d

[5] MetaRail merely notes that the PTO cited *DDR*. Opp. at 16. As Google explained and MetaRail does not dispute, the Court does not owe the PTO's analysis any deference. Br. at 20 n.7.

[6] Moreover, given that programmers had previously been linking variables manually when creating deep-linked ads (3:16-25), such ads were—by MetaRail's own account (Opp. at 15)—capable of passing and pre-populating dynamic data (as in the purportedly "New Advertisement").

at 1262)—namely, embedding the "integration tag." The result was a "***particular type*** of computer technology" yielding "a ***particular type*** of custom" message. *Attentive*, 2023 WL 6215825, at *6.[7] In other words, the "integration tag" at issue in *Attentive* was detailed "code representing integrator instructions" (Ex. 1 at 5:35-36) that actually changed and improved how the webpage operated.

By contrast, the '626 specification merely stresses the need for an "automated way to generate deep-linked ads" of the sort the patent admits already existed—enabling them for a "***greater cross-section*** of publisher and advertiser sites." 3:36-42. As column 3 of the patent concedes, programmers had previously created deep-linked ads between publisher and advertiser sites by manually developing "programmatic integrations between variables and fields." 3:16-20. The only difference between this and the '626 Patent is that the patent relies on a "universal schema" (i.e., the "universal variable map") for translating variables to "programmatically create an ad with accurate mappings ***without any human intervention***." 13:65-14:2.

This admission—which MetaRail mischaracterizes (*supra* §§ I-II.A) and otherwise ignores—further distinguishes Claim 1 from both *DDR* and *Attentive*. The '626 Patent generically describes the "universal variable map" as any "database" (10:3-5), and MetaRail concedes that the map's translation functionality merely allows for the automation of steps previously performed manually. Automating known steps does not constitute an "improvement to computer functionality." *VideoShare, LLC v. Google, Inc.*, C.A. No. 13-990, 2016 WL 4137524, at *6 (D. Del. Aug. 2, 2016) (distinguishing *DDR*), *aff'd*, 695 F. App'x 577 (Fed. Cir. 2017). Google cited *VideoShare* for this very same point. Br. at 10. Tellingly, MetaRail has no response.

[7] Similarly, the claims in *TecSec* (Opp. at 10) centered on an "object-oriented key manager" that "improv[ed] a basic function of a computer data-distribution network." 978 F.3d 1278, 1295-96 (Fed. Cir. 2020). The claims in *Core Wireless* (Opp. at 11) likewise concerned a "specific improvement over prior systems"—one limited to a "particular manner in which" a window was accessed—yielding an "improved user interface." 880 F.3d 1356, 1362-63 (Fed. Cir. 2019).

## III. *ALICE* STEP TWO: CLAIM 1 LACKS AN INVENTIVE CONCEPT AND INSTEAD MERELY AUTOMATES A CONVENTIONAL ONE

MetaRail's admissions likewise confirm that Claim 1 does not recite "something more" than the abstract idea under *Alice* Step Two. Instead, as the Federal Circuit found in *Weisner* when holding that multiple patents claimed ineligible subject matter, "statements in [MetaRail's] specification" confirm that Claim 1 "rel[ies] on the use of existing technology" (51 F.4th 1073, 1083-84 (Fed. Cir. 2022))—namely, the same methods programmers had used to create deep-linked ads by manually linking variables across multiple sites (*see supra* § 1). The only difference between these manual methods and the claimed invention is the abstract idea of translation and indexing as reflected in the claimed universal variable map. MetaRail freely admits the same: the "claimed technique" uses "a universal variable map of programming variables…to link publishers' websites and advertisers' websites and to generate and serve a deep-linked ad." Opp. at 18.

Thus, despite MetaRail's "no preemption" argument, Claim 1 ***does*** preempt any attempt to automate the existing manual methods described in column 3 of the '626 Patent. As Google explained and MetaRail never contests, the universal variable map can take any form. *See supra* § II.B.2. Claim 1 does not claim any "specific implementation" of that concept (i.e., indexing and translation)—unlike the claims in two ***other*** *Weisner* patents. 51 F.4th at 1087. MetaRail's reliance on that latter portion of *Weisner* (Opp. at 17-19) thus fails.

## IV. METARAIL'S ADMISSIONS CONFIRM THERE IS NO FACTUAL DISPUTE

While asserting that "factual disputes" exist (Opp. at 19-20), MetaRail never even acknowledges the specification's admission that human programmers had already been manually creating the same sort of "deep-linked ad connections" the inventors sought to generate in an "automated way." 3:16-42. Nor does MetaRail refute that the Court "need not accept as true allegations that contradict… the patent specification." Br. at 7 (quoting *Secured Mail)*.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: */s/ David E. Moore*
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew M. Moshos (#6685)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

*Attorneys for Defendant Google LLC*

OF COUNSEL:

Gregory F. Corbett
Charles T. Steenburg
Marie A. McKiernan
Jie Xiang
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Tel: (617) 646-8000

Elizabeth A. DiMarco
John W. McGrath
WOLF, GREENFIELD & SACKS, P.C.
601 Massachusetts Avenue, NW
Washington, DC 20001
Tel: (202) 571-5001

Dated: February 23, 2024
11348918 / 12599.00061